Terry L. WEBB, Petitioner–Appellant,

v.

Samuel A. LEWIS, Respondent–Appellee.

No. 93–16167.

United States Court of Appeals,
Ninth Circuit.

Submitted May 12, 1994 *.

Decided Aug. 24, 1994.

Amended Oct. 13, 1994.

Further Amended Dec. 8, 1994.

---

* The panel unanimously finds this case suitable for submission without oral argument. Fed. R.App.P. 34(a); 9th Cir.R. 34–4.

Stafford W. Prante, El Cajon, CA, for petitioner-appellant.

Diane M. Ramsey, Asst. Atty. Gen., Phoenix, AZ, for respondent-appellee.

Before FERGUSON, NOONAN, and T.G. NELSON, Circuit Judges.

Opinion by Judge NOONAN; Dissent by Judge T.G. NELSON.

## ORDER

The opinion filed August 24, 1994, 33 F.3d 1079, and amended October 13, 1994 has been amended as follows:

Slip opinion p. 12581, ¶ 2, line 6 [at p. 1084] strike "In this case" after "the hearsay". Insert: "We are not bound by the dictum in *Swan, supra* at 1391 interpreting *Wright* as suggesting the contrary. While the evidence here is not essential to our holding,"

## OPINION

NOONAN, Circuit Judge:

Terry L. Webb appeals the denial by the district court of a writ of habeas corpus freeing him from imprisonment by the state of Arizona. Holding that there has been a gross denial by Arizona of a right secured to Webb under the Confrontation Clause of the United States Constitution, we reverse the judgment of the district court and direct the issuance of the writ.

### FACTS AND PROCEEDINGS

In the summer of 1986 Leslie Morton was separated from her husband and living in a trailer park with her two children, David, age 10, and Heather, age 2½. She worked the night shift at the Little Brown Jug, finishing around midnight or in the small hours of the morning.

Because of her work, Leslie Morton had to find babysitters for her children. She usually left David with her own parents but because of Heather's difficult behavior she thought her parents would not be able to cope with her. She found other babysitters in her next-door neighbors in the trailer park, Terry Webb and his companion Cindy Hammontree, who had a child of their own, Cody. Leslie Morton thought of Terry and Cindy as her best friends.

During the summer months Heather Morton stayed on occasion with Terry and Cindy and wrestled with Cody. When Heather stayed overnight with Terry and Cindy, her mother would bathe her in the morning. Her mother never noticed any signs suggesting abuse by Terry or by Cindy. Heather never spoke to her mother of any abuse. In late August 1986, when her mother was putting on cream for a bladder infection and referred to it as "medicine," Heather said to her, "Terry put medicine on me." Her mother had "no idea" of what Heather meant.

In September 1986 Leslie Morton began to use a new babysitter during the day, Connie Martin. Connie used her home to babysit a number of children, supplementing her income as a church custodian. On four other occasions Connie Martin had reported to the

authorities that a child in her care had suffered sexual abuse.

On September 23, 1986, when Connie was "hustling about trying to find her checkbook" and paying little attention to the children as "there was kind of a lot of chitter-chat," Heather said that Terry had put medicine in her. She then said, "Terry is a bad man, he hurt me." Connie Martin's husband then asked Heather to tell his wife why Terry was a bad man. Heather went on, according to Connie Martin, to accuse Terry Webb in childish language of digitally assaulting her genitals and of instructing her not to tell. Connie Martin's response was "to mask the horror of it the best that I could," to put her arms around her, and to ask her questions "in the most non-threatening way" in order "to derive some basic information." Connie was immediately convinced of Terry's criminal guilt: "I emotionally didn't feel like I could stand the horrendousness of this heinous crime that was committed against this child."

On September 30, 1986, Connie Martin told Heather. "Heather, you know what Terry did to you was very very bad, and that Heavenly Father and Jesus does not like bad things to happen to his little children, and He has given us special friends to help us." According to Martin, this statement was made as a way of preparing Heather for "special friends" from the Children Protective Service of the Division of Economic Security of the State of Arizona.

Also on September 30 Connie Martin for the first time informed Leslie Morton of what Heather had said to her about Terry. This conversation was overheard by Heather, who ran over and said, "Terry no do those things to me, Connie."

Connie Martin then informed the district attorney's office of LaPaz County, Arizona about what she said Heather had first said to her by way of accusations against Terry Webb. Allan Duprey from the Victim Witness Office in LaPaz County arranged to have Heather interviewed in San Diego, California at the Center for Child Protection at Children's Hospital and Health Center. Duprey accompanied Heather and her mother to the Center on October 16, 1986. At the Center for Child Protection Heather was interviewed by Linda Proctor, a social worker holding a B.A. and M.A. in Social Work from San Diego State University. This interview was videotaped and constituted part of the state's case against Terry Webb. It is discussed at greater length below.

After the interview with Proctor, Heather was medically examined at the Center for Child Protection by Sylvia Strickland, a physician specializing in child abuse cases and often consulted by law enforcement and child protection services. Strickland found fibroblasts in Heather's hymen that she interpreted to be scar tissue from the use of force on the hymen; she also formed the opinion that the opening of the hymen had been enlarged beyond its normal size. She believed that the abrasions would have been caused by several episodes over a period of no less than two months. She had no means of knowing when the episodes would have occurred, except that it would have been more than two weeks before the examination and not over a year from October 1986.

Webb was indicted. A pretrial hearing was conducted on February 18, 1987 as to the admissibility of certain statements against him. The hearing was convened pursuant to Arizona Criminal Code § 13–1416, which made admissible a statement by a minor under the age of 10 describing any sexual offense witnessed by the minor provided that, in a hearing before the judge, it was established "that the time, content and circumstances of the statement provide sufficient indicia of reliability" and that the minor testified or, if unavailable, there was corroborative evidence of the statement. In 1987 the Arizona Supreme Court found this statute to be unconstitutional. *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801, 808 (1987). At the hearing in 1987 held prior to this decision, the trial court found the videotape and other hearsay reports of Heather's statements to be admissible.

Webb's trial followed. No person who had seen the alleged criminal acts of Webb testified. Heather Morton herself refused to answer questions put to her by the judge outside the courtroom. The state did not pres-

ent her as a witness. Neither did the state present as a witness Terry Webb's companion Cindy, who, if some of the hearsay was correct, had actually witnessed the abuse. The state's entire case connecting Webb to the injuries found by Dr. Strickland was made up of hearsay reported by Connie Martin, Leslie Morton and Linda Proctor and of the videotaped interview with Heather. The videotape was taken by the jury into the jury room during its deliberations.

Webb was convicted of both counts and sentenced to consecutive prison terms of 17 years and 20 years for a total of 37 years imprisonment. He appealed, contending that his Confrontation Clause rights had been violated. The Arizona Court of Appeals affirmed his conviction. The Arizona Supreme Court denied his petition for review.

On October 17, 1990 Webb filed pro se his petition for habeas corpus in the federal district court for the District of Arizona, again alleging the deprivation of his Confrontation Clause rights. On February 27, 1991 the case was referred to a magistrate. On July 15, 1993, one year and four months later, the magistrate made a report and recommendation to deny the petition. Nine months after this report and over two and a half years after the filing of the petition, on April 30, 1993, the district court denied Webb's petition. The district court also declined to provide counsel for Webb.

Webb appealed. A motions panel of this court ordered that he be provided with counsel.

### ANALYSIS

The videotape of Linda Proctor interviewing Heather Morton is a film of thirty minutes duration, in which Proctor interviews Heather about the alleged sexual acts performed on her by Webb. The purpose of this interview, according to Proctor's own testimony, was to obtain a statement from her. The interview is conducted with the care and skill of a person who for six years has interviewed alleged victims of child abuse. The social worker first interests Heather in playing with dolls and engages her in questions about her home and family and babysitter.

The interviewer then focuses on the sexual characteristics of the dolls and induces Heather to comment on them. In the course of the half-hour, Proctor repeatedly turns the conversation into questions about the conduct of Terry to Heather, salting the conversation three times with the comment that Terry is a bad man or did a bad thing. The social worker asks Heather directly whether she suffered any injury from Terry and whether she now has any injury; that is the extent of her questions that could be considered medical. Her focus is on discovering sexual abuse. She persistently returns to this theme as Heather's attention wanders to the dolls. In a way that would never be permitted in a judicial setting, Proctor repeats questions that Heather declines to answer.

The problem of obtaining evidence of sexual abuse of a small child while observing the requirements of due process of law has led to the admission of evidence under firmly rooted exceptions to the hearsay rule. Otherwise the statements are " 'presumptively unreliable and inadmissible for confrontation clause purposes' ". *Idaho v. Wright,* 497 U.S. 805 at 818, 110 S.Ct. 3139 at 3148, 111 L.Ed.2d 638 (1990), quoting *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986).

■ The state of Arizona contends that the videotape is admissible "under the firmly rooted hearsay exception of medical diagnosis or treatment and thus no further guarantees of trustworthiness are required." The exception to the hearsay rule invoked by the state is, of course, firmly rooted. It is astonishing, however, to have the state contend that Proctor, a social worker, was engaged in medical diagnosis or treatment. Nothing in the videotape supports this statement. At the trial the prosecutor offered an argument not repeated on appeal: that the interview by Proctor was preparatory to the medical examination by Strickland, and the latter could be considered therapeutic. This argument, while showing that Strickland was prepared by Proctor to find that Heather had been abused, does not convert the social worker's interview into a medical procedure. Moreover, Strickland was being consulted by Allan Duprey of the Victim Witness Office

for law enforcement purposes; she was not prescribing for Heather as her patient.

■ The state now argues: "Heather had no motive in traveling to a San Diego hospital and making the statements other than a patient seeking or needing treatment." There is not the slightest indication in Heather's conduct that she is a patient seeking or needing treatment. She was brought from Arizona to California at the request of the prosecuting authorities and in the company of a state official charged with protecting witnesses in criminal trials. Her only reported comment as the adults took her to California was concern that she would be made to pull down her panties. To suppose that Heather had the capacity to seek medical help on her own or to suppose that the purpose of the victim witness protection program was seeking therapy is to engage in fantasy. It is on the basis of such fantasy that the state has defended its use of the videotape in Webb's trial.

■ Even if the hearsay does not fit within an established exception, however, its admissibility is not barred by the Confrontation Clause if, considered apart from any corroborating evidence, there was " 'a showing of particular guarantees of trustworthiness' ". *Idaho v. Wright,* 497 U.S. at 818, 110 S.Ct. at 3148, quoting *Ohio v. Roberts,* 448 U.S. 56 at 66, 100 S.Ct. 2531 at 2539, 65 L.Ed.2d 597 (1980). The circumstances to be considered are the totality of circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief"—so worthy of belief " 'that the test of cross-examination would be a work of supererogation.' " *Idaho v. Wright,* 497 U.S. at 819, 110 S.Ct. at 3149, quoting *Wigmore on Evidence* § 1420 (1974 ed.). The guarantees of trustworthiness "must be at least as reliable as evidence admitted under a firmly rooted hearsay exception." *Idaho v. Wright* at 821, 110 S.Ct. at 3149, citing *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. An "affirmative reason, arising from the circumstances in which the statement was made," is necessary to rebut the presumption of unreliability and exclusion under the Confrontation Clause. The state contends that the court is imposing a new rule.

To the contrary, *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) applied established precedents in measuring the admissibility of hearing from a child. *Id.*

The Supreme Court declined to list what would constitute the necessary guarantees, but, without approving the results reached in the cases it cited, it gave a list of factors that could appropriately be considered by a trial court: "use of terminology unexpected of a child of similar age"; "spontaneity and consistent repetition"; "mental state of the declarant"; "lack of motive to fabricate." *Id.* at 821–22, 110 S.Ct. at 3150. In *Idaho v. Wright* itself the trial court had admitted the hearsay of a child 2½ years old, finding (1) that she had no motive to lie and (2) that the statements made to her doctor about Daddy touching her pee-pee were not "of the type 'that one would expect a child to fabricate.' " *Id.* at 826, 110 S.Ct. at 3152, citing trial judge. The Supreme Court of Idaho found the presumptive unreliability of these statements to be unaffected by these findings and reversed the defendant's conviction. The Supreme Court of the United States agreed, holding that the circumstances found by the trial court offered "no special reason for supposing that the incriminating statements were particularly trustworthy." *Id.*

The Supreme Court of Idaho also found that the trial court had erred in admitting the two-year-old's statement to her doctor, "he does it a lot more with my sister." The Supreme Court of the United States agreed, although "the spontaneity of the statement and the change in demeanor" suggested that she was telling the truth. The Supreme Court emphasized that "it is possible" that where there was prior interrogation or prompting or manipulation by adults, spontaneity was an inaccurate indicator of trustworthiness. *Id.* at 826–27, 110 S.Ct. at 3152–53.

■ In the light of *Idaho v. Wright* and its specific examples of testimony that failed to rebut the presumption of unreliability, we examine whether circumstances surrounding the making of Heather's statements on the videotape made her particularly worthy of belief so that the test of cross-examination would have been a work of supererogation.

As "no mechanical test prevails," *Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir.1993), the character of the guarantees of trustworthiness in this case must be weighed. We are not to second-guess the state courts. *Id.* at 1378. It is not our task to retry the case, or to determine Webb's guilt or innocence, or even to decide if Heather's statements were true. But on the ultimate determination of trustworthiness we act de novo. *Id.* at 1379. Our task under the Constitution is to determine if these presumptively unreliable statement were made under circumstances affirmatively establishing that they were so reliable that cross-examination of Heather was "of marginal utility." *Idaho v. Wright*, 497 U.S. at 820, 110 S.Ct. at 3149.

■ Taken by itself, the videotape does not carry guarantees of trustworthiness. Heather's language is not "unexpected of a child of similar age." The video does not contain a declaration of Heather made soon after the alleged assaults; her "state of mind," as used in the case cited by *Wright*, was not the state of mind of one excitedly reporting a recent assault. In the interview, within two minutes of the start of filming, Heather told Proctor that Terry pulled down his pants and put medicine in her. Captured by the camera, her statement comes through with a force and vividness and apparent spontaneity that are striking. Such a precise statement to a stranger, a person Heather had never seen before, invites reflection on what had prepared Heather to be so candid. The inescapable facts are that, for almost a month preceding the interview, she had been asked about Terry's conduct by Connie Martin, Mr. Martin, her mother, Allan Duprey and other state authorities. If the Supreme Court of the United States in *Idaho v. Wright* found the mere possibility of prior interrogation to destroy spontaneity as a valid indicator, a fortiori Heather's initial accusation on the tape must be stamped as insufficiently reliable and as the product of previous questioning.

Thereafter on the tape, Heather gave a variety of answers about Terry after Proctor had deliberately probed with questions about Terry's conduct and after Proctor had described Terry or his actions as bad. In addition, Heather's accusations are marked with grave inconsistency on the principal sexual allegations—according to Heather, Terry did and did not engage in oral sex with her; according to Heather, his vaginal assault on her was by medicine obtained from a bottle.

The videotape fails to pass the criteria set by *Wright*. There are additional reasons for holding it unreliable. *Wright* forbids recourse to other evidence to corroborate the trustworthiness of the hearsay offered; *Wright* does not forbid recourse to other evidence that confirms the presumptive unreliability of the hearsay. We are not bound by the dictum in *Swan, supra* at 1391 interpreting *Wright* as suggesting the contrary. While the evidence here is not essential to our holding, there is a good deal of such evidence.

As to consistency, Heather on September 30, 1986 had denied that Terry had done "those things to me." In the videotape interview she used the term "medicine" in a way that could have been understood to mean male semen, but her usage of this term varied. For example, on December 10, 1986, in an interview with Jacqueline Scheider, a psychotherapist, Heather told her: "They spilled the medicine all over Mommy's car and Mommy had to clean it up." Asked about this incident, her mother said that she, the mother, had spilled some hair gel in the car and had had to clean it up. The mother later said that Terry and Cindy had spilled the gel. Here "medicine" as used by Heather almost certainly referred to a commercial product.

As to Heather's reputation for truthfulness and as to whether she had any tendency to fantasize, her mother was asked at trial whether Heather ever lied to her and replied, "Not a lie. She's only three years old." Asked if Heather knew the difference between a lie and a truth, her mother said, "As well as any three-year-old does." Pressed on cross-examination, her mother admitted that when Heather was "fighting" with her ten-year-old brother David, she would blame David, not necessarily truthfully, "things like that"—for example, Heather had blamed David for breaking the back of the toilet seat.

On September 23, 1986, on the same occasion on which she first accused Terry to Connie Martin and her husband, Heather also declared to Connie, "Terry had made her mother Leslie pull down her pants and he pulled down his pants, and 'he put his pee pee in where she pee pees.'" Heather's mother testified that she had never had a sexual relationship with Webb. On this point either her mother lied or Heather lied or fantasized. There is no way of telling which alternative is true. It is clear that her mother did not believe Heather spoke truthfully about this significant sexual action Heather said that Terry had performed.

On September 30, 1986, Heather told Connie: "I can't talk any more about my mother being a bad girl and pulling her panties down because she's going to get really sick and she's going to cry and the cops is going to get really mad at me." Her mother testified that she never told Heather not to talk about Terry. Again it is evident that her mother believed that Heather had not told the truth to Connie. Did her mother instruct Heather not to repeat the charge about her and Terry having sex? According to her mother's testimony, Heather lied about her mother's instructions.

If Heather had in fact observed sex between a man and her mother, it seems possible, if not actually probable, that she could fantasize that Terry had done something similar with her. Her motive would have been to absorb or cushion the trauma of seeing her mother engaged in intercourse. Leslie Morton, in fact, admitted that she had had intercourse with Terry's brother Irwin, although she denied that Heather could have seen it. Irwin refined Leslie Morton's admission by saying Leslie had given him oral sex; like Leslie he denied that Heather had seen them.

In summary, Heather was inconsistent in her accusations and in her use of the key accusatory term. She did not use unusually sophisticated language in setting out the accusations. She had a possible motive to fabricate them. According to Irwin Webb and her own mother she did fabricate another sexual accusation. Her videotape statements carry far fewer guarantees of trustworthiness than those rejected by the Supreme Court of Idaho and by the United States Supreme Court in *Idaho v. Wright.*

■ The videotape was inadmissible evidence seen by the jury and brought into the jury room during the jury's deliberations. Admission of this evidence violated in a gross fashion Webb's right to confront the evidence against him. After a careful review of the entire transcript of the trial, we conclude that this inadmissible evidence had an actual and prejudicial effect upon the jury. *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Consequently Webb's conviction must be set aside.

As the use of the videotape alone was such a substantial violation of Webb's Confrontation Clause rights, we need not on this appeal evaluate the further violations alleged by the admission of hearsay reported by Connie Martin and by Leslie Morton. If, however, these statements are to be used again they must be reevaluated in the light of this opinion and of *Idaho v. Wright.* Their earlier admission under a statute now found by Arizona to be unconstitutional is now irrelevant.

Accordingly, the judgment of the district court is reversed. The district court is ordered to issue the writ sixty days from the issuance of the mandate, unless within that time the state of Arizona indicates to the district court its intention to retry Webb. In that event, the district court shall order Webb released to the proper authorities for the purposes of retrial.

T.G. NELSON, Circuit Judge, dissenting:

Although I agree with the majority that the videotaped interview between Proctor and Heather was not admissible pursuant to the medical diagnosis exception, I dissent from the majority's conclusion that Heather's videotaped statements were not admissible pursuant to the residual exception because they lacked particularized guarantees of trustworthiness.

The Supreme Court has held that particularized guarantees of trustworthiness are to be determined from "the totality of circum-

stances that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990). The Court concluded there is no exclusive set of factors to be evaluated to determine the trustworthiness of a statement. Consequently, it advised that courts are to be given "considerable leeway in their consideration of appropriate factors." *Id.* at 822, 110 S.Ct. at 3150.

In this case, the majority reviews the facts surrounding Heather's statements and holds that the only possible conclusion to be drawn from Heather's use of age-appropriate language and the spontaneity of her statements is that Heather's statements were unreliable. I disagree and believe that the majority's method of adopting a singular inference from factors which support multiple inferences is contrary to *Wright* and deprives courts of their broad discretion to consider the relevant factors in each particular case.

I disagree that Heather's failure to use language "unexpected of a child of similar age" supports the conclusion that her statements were unreliable. The Court in *Wright* did note that the declarant's use of terminology unexpected of a child of similar age is a factor indicating reliability. *Id.* at 821, 110 S.Ct. at 3149–50. However, relying on the converse, the majority states the fact that Heather's language was *not* unexpected of a child of similar age as a basis for its conclusion that Heather's statements lacked guarantees of trustworthiness.

It is true the anatomical terms used by Heather were entirely consistent with a child of similar age of two and one-half years. She referred to both male and female genitals as "things," to the posterior area as "butt," to female breasts as "boo-boos," and specifically to Webb's penis as "pee-pee." In *Swan v. Peterson,* 6 F.3d 1373 (9th Cir.1993), *cert. denied,* ⸻ U.S. ⸻, 115 S.Ct. 479, 130 L.Ed.2d 393 (1994), we approved of the trial court's reliance on the child declarant's description of "sexual acts in specific terms, using *age-appropriate* language" as a factor supporting reliability. *Id.* at 1380 (emphasis added). We noted consideration of this factor was consistent with the Supreme Court's

statement in *Wright* that courts have considerable leeway in their consideration of appropriate factors. *Id.* However, contrary to *Swan,* the majority establishes a bright-line rule that only language inappropriate for a child of similar age indicates reliability.

I do not agree that Heather's use of age-appropriate terminology supports the conclusion that her statements were unreliable. A child molester cannot be expected to offer a course in correct anatomical terminology while molesting a child, nor could a child as young as Heather be expected to remember such terminology even if it were used. The crucial inquiry should not be whether the language is appropriate or inappropriate for a child of similar age, but whether the language employed by the child adequately describes a sexual encounter. Heather did describe explicit sexual encounters with specificity in age-appropriate language. An example of one such statement is Heather's claim that Webb pee-peed in her mouth. Surely, this language is explicit enough to ensure the truthfulness of Heather's claim that Webb had sexually abused her, regardless of the fact that Heather did not use sophisticated language.

I also disagree with the majority's conclusion that no incriminating statement can be considered spontaneous if the child has been previously questioned about the abuse. The Supreme Court in *Wright* cites with approval a case relying on spontaneity and consistent repetition as factors indicating reliability. *See Wright,* 497 U.S. at 821, 110 S.Ct. at 3149–50. However, according to the majority, the spontaneity of Heather's statements to Proctor is a factor indicating unreliability. The majority reasons that because Heather had been questioned by her care-givers and investigators regarding her accusations prior to the videotaped interview with Proctor, Heather's spontaneous accusation during the interview "must be stamped as insufficiently reliable and as the product of previous questioning." Slip op. 1392. The majority's reasoning stands for the proposition that if there has been any prior investigation, spontaneity can never be a factor supporting reliability.

Adherence to such a proposition would immunize sexual abusers from all but one accu-

satory statement of those children they abuse, *i.e.,* the first spontaneous statement of the abused child. After a child's first spontaneous statement alleging abuse, an investigation of the child's claim will necessarily ensue, and the focus of the investigation will be on the child. Pursuant to the majority's reasoning, however, investigators may not question the child, otherwise, any future statements by the child are unreliable. Conversely, if the investigators do not question the child, they cannot determine if there is any substance to the child's complaint. Thus, prosecution of a sexual abuser of a very young child such as Heather can never occur, either because the child cannot be questioned, or because the child has been questioned. The fact that the child is willing to talk without prompting at subsequent discussions regarding the abuse, as Heather did during her interview with Proctor, cannot be a factor indicating unreliability. If it were, every investigation would inevitably lead to the conclusion that the case cannot be successfully prosecuted.

Finally, the majority is critical of Proctor's description of Webb as bad. However, the majority fails to place Proctor's comments in context. Proctor's first comment about Webb, *i.e.,* that Webb should be told not to pee-pee in Heather's mouth, occurred twenty minutes into the interview after Heather had already said that 1) Webb pulled down his pants; 2) he put medicine [1] in "there" (pointing to her vaginal area); 3) his penis "got little" afterwards; and 4) he pee-peed in her mouth. While Proctor's comment was inappropriate, it should not distract us from the proper inquiry: Were Heather's statements prior to Proctor's first negative comment sufficiently shown to be reliable? I conclude that they were. Heather's statements were in age-appropriate language; they were internally consistent; and they were spontaneous or in response to appropriate, non-leading questions. The majority's statement that the Proctor's repetitious questions would not

have been permitted by a court is incorrect. Trial courts have great latitude in handling young or vulnerable witnesses. *See United States v. Castro–Romero,* 964 F.2d 942, 944 (9th Cir.1992) (holding district court did not abuse its discretion by allowing Government to ask leading questions of eight-year-old witness reluctant to testify regarding sexual abuse).

Under the totality of the circumstances surrounding the interview, up until Proctor began to denigrate Webb, I believe Heather's videotaped statements met the test of *Wright.* Thus, the only remaining inquiry is whether Proctor's comments rendered the admission of the tape an error of constitutional dimension. Proctor made three negative comments about Webb. After the first negative comment, Heather said that Webb did it more than one time; Cindy watched but did not say anything; Webb's "thing" touched her vaginal area; and Webb took pictures while he was doing a bad thing. Heather later retracted the statement about the pictures.

Proctor's gratuitous negative comments about Webb were clearly improper. They had the capacity to color Heather's following statements. However, I do not believe the admission of this later portion of the videotape rose to the level of a constitutional error. The majority of Heather's incriminating statements were elicited before Proctor began to counsel her. At most, admission of the last minutes of the videotaped interview was harmless error. As the Supreme Court in *Wright* noted, "the presence of corroborating evidence ... indicates that any error in admitting [a] statement might be harmless." 497 U.S. at 823, 110 S.Ct. at 3150–51 (footnote omitted). In this case, corroborating physical evidence existed to support Heather's claim that she had been sexually abused: Heather's examining physician testified that Heather's physical condition was consistent with sexual abuse.

---

1. The majority contends Heather's statements were inconsistent because she used the term "medicine" when referring to hair gel and also when referring to what "could have been understood to mean ... semen." Maj. op. 1392. The majority, without basis, presumes Heather was

referring to semen when she indicated Webb put medicine in her vaginal area. However, what it fails to recognize is that perhaps what Heather meant by medicine was a clear liquid gel—such as a lubricant.

After killing the tape and burying it, the majority digs it up and buries it again by discussing all the extrinsic evidence demonstrating its unreliability. I dissent from the several pages of *dicta* offered by the majority during this second burial. In this *dicta,* the majority concludes that extrinsic evidence bolsters its conclusion that Heather's statements are unreliable reasoning that *"Wright* does not forbid recourse to other evidence that confirms the presumptive unreliability of the hearsay." Slip op. 1392. In *Wright,* the Supreme Court held that extrinsic evidence could not be used to bolster the *reliability* determination. *See* 497 U.S. at 823, 110 S.Ct. at 3150–51. It did not hold, however, that extrinsic evidence could be used to bolster the presumptive *unreliability* of the hearsay. Having already held that the presumption of unreliability of Heather's statements had not been overcome, there is simply no reason for the majority to decide the flip side of *Wright* in this case. Further, in doing so, the majority ignores our previous statement in *Swan* regarding the use of extrinsic evidence to establish unreliability:

> *Wright* forbids using other corroborating evidence at trial to show that an initial hearsay statement is reliable. The issue here is subtly different: can arguable *noncorroborating* evidence be used to demonstrate the *unreliability* of a hearsay statement? *Wright's* caution against reference to other evidence at trial suggests not.

*Swan,* 6 F.3d at 1381 (footnote omitted).

In sum, I cannot agree with the majority's method of adopting singular inferences from factors to support its conclusion, thereby ignoring many other reasonable inferences to be drawn from those factors. Furthermore, I dissent from the extensive *dicta* offered by the majority. In the future, the question of whether noncorroborating evidence may be used to demonstrate unreliability should be addressed in a case where the answer is needed, unhampered by the decision in this case.