72 F.3d 136
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald Lee BUTTERFLY; Mary Carmalita Butterfly,
Defendants-Appellants.
 Nos. 94-30412, 94-30413.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 11, 1995.
Decided Dec. 7, 1995.
 
 Before: WRIGHT, ALARCON and CANBY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 We affirm the convictions of Ronald Butterfly ("Ronald") and Mary Carmalita Butterfly ("Carma") for aggravated sexual abuse in connection with the molestation of their four nephews, but we vacate and remand Carma's sentence. Our jurisdiction: 28 U.S.C. Sec. 1291. We discuss below the many issues defendants raised on appeal.
 
 A. Ronald's Competence to Stand Trial
 
 3
 We consider first whether Ronald was competent to stand trial. We review for clear error the court's decision that he was, viewing the evidence in the light most favorable to the government. United States v. Frank, 956 F.2d 872, 874 (9th Cir.1991).
 
 
 4
 Dusky v. United States, 362 U.S. 402 (1960), establishes the test for determining a defendant's competency: the government must prove by a preponderance of the evidence that the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and "has a rational as well as factual understanding of the proceedings against him." See also 18 U.S.C. Sec. 4241(d) (defendant must be able to understand the nature and consequences of the proceedings against him and to assist properly in his defense).[1]
 
 
 5
 At the competency hearing, government witness Dr. Frederick opined that Ronald understood the charges against him and knew that there would be a "process to determine whether he should go to prison." According to Dr. Frederick, Ronald could understand the trial if his attorney gave him simple and repeated explanations of the process. "If you are patient with him, he can understand almost everything that's going on around him." Dr. Frederick acknowledged that Ronald's "ability to abstract is severely compromised," meaning that although he would understand the content of witnesses' testimony, he would not be able to interpret their statements. He would not be able to assist his attorneys by "analyzing the family dynamics" or ascribing motives to his nephews.
 
 
 6
 Defense psychologist Dr. Scolatti's diagnostic findings were similar to Dr. Frederick's, but he concluded that the effect of Ronald's symptoms on his ability to assist in his defense would be more dramatic. Dr. Scolatti believed that to be competent, Ronald would have to be able to "tie in some of those family dynamics" and "be able to look at two ideas or two events that happened and tie them together or point out the discrepancies in them." He also testified that Ronald would be unable to follow along through the trial because he has difficulty with new language concepts and because he would "be stuck in the mud on one issue." He believed that Ronald's grasp of the judicial process was unsatisfactory.
 
 
 7
 In finding Ronald competent, the court announced that it had "exhaustively considered the reports and testimony provided by the experts," and had found Dr. Frederick "more persuasive." The court remarked that it was relying particularly on Dr. Frederick's conclusions that Ronald understood the nature and magnitude of the charges against him and generally understood the judicial process. The court also promised to proceed slowly and provide frequent breaks so that Ronald's attorney could communicate with him and explain the proceedings to him.[2]
 
 
 8
 As to Ronald's ability to assist in his defense, the court noted that the facts of the case were not complex, and that the alleged crimes involved family members and occurred in surroundings familiar to Ronald. The court concluded that this familiarity would help Ronald in "assessing the accuracy of the facts related by the alleged victims." The court implicitly rejected Dr. Scolatti's view that a minimally competent defendant would be one who could analyze witness testimony and point out discrepancies. Instead it accepted Dr. Frederick's determination that an ability to understand the facts of his case is sufficient. We have found no authority, and the defendant has pointed to none, requiring that the defendant be able to assist his attorney in crafting cross-examination or developing strategy to be found competent. The court did not clearly err by accepting Dr. Frederick's conclusion.
 
 
 9
 Ronald insists that United States v. Hoskie, 950 F.2d 1388 (9th Cir.1991), dictates a finding of incompetency. It is true that Hoskie's disabilities were similar to Ronald's. See id. at 1390 (defendant's ability to conceptualize and understanding of court proceedings was "extremely limited"; defendant was "virtually incapable" of abstract thought). But we did not find clear error in Hoskie because of these defects. Rather, our decision was based in large part on the fact that both the district court and the government psychologist considered improper factors in finding Hoskie competent.[3] And important to the Hoskie court's ruling was the fact that although Hoskie was able to develop some understanding of the proceedings, he could not retain that understanding even for a few minutes. Id. at 1393. Ronald had no such problem.
 
 
 10
 Viewing the evidence in the light most favorable to the government, we cannot say that the court committed clear error in finding Ronald competent to stand trial.
 
 B. Competence of Victim/Witnesses
 
 11
 We reject Ronald and Carma's contention that the four victims were incompetent witnesses. The court's determination that a witness is competent is reviewed for clear error, Pocatello v. United States, 394 F.2d 115, 116 (9th Cir.1968), as is the court's decision not to hold a competency hearing. United States v. Gutman, 725 F.2d 417, 420 (7th Cir.1984).
 
 
 12
 A child witness is presumed competent, 18 U.S.C. Sec. 3509(c)(2), and there are no mental qualifications for witnesses. Fed.R.Evid. 601, advisory committee's note. The question of mental capacity "is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." Id.; see also United States v. Phibbs, 999 F.2d 1053, 1068 (6th Cir.1993) (rules of evidence strongly disfavor barring witnesses on competency grounds due to mental incapacity). We have held children are competent witnesses if they "appreciate[ ] the difference between truth and falsehood" and possess the "required capacity for observation, recollection and communication." Pocatello, 394 F.2d at 116.
 
 
 13
 Here, the court or counsel asked each boy whether he understood the difference between the truth and a lie. Douglas, Leonard and Stephen all testified that they knew the difference. Douglas and Stephen testified that they understood that they had taken an oath to tell the truth. The defense was not denied any opportunity to put before the jury evidence that the boys' mental defects made them unreliable witnesses. There is nothing in the record to suggest that the three younger boys were not competent.
 
 
 14
 Brandon's testimony was inconsistent: he testified that he understood the oath, but later said that he had no duty to tell the truth, and he did not care that he was under oath. He also testified that he did not know what would happen to him if he lied in court. A therapist testified that Brandon did not know whether his stories of abuse were true or false.
 
 
 15
 The court, however, appeared to believe that Brandon's inconsistent testimony and poor behavior were attributable not to incompetence but to fear, suggesting on at least two occasions that Brandon seemed terrified and may have been threatened. Because the district court had the advantage of direct observation and we do not, we will not disturb the court's determination absent some clear indication that its inference was wrong. We find none. Cf. Gutman, 725 F.2d at 420-21 (inconsistent testimony of mentally ill witness does not disqualify him). The court did not clearly err in finding the four children competent to testify.
 
 C. Admission of Videotaped Interview
 
 16
 After direct examination of Brandon, during which he either denied or could not recall most of the abuse he had earlier reported, the government introduced a videotaped interview between Brandon and an FBI agent. On the tape, Brandon implicated Ronald and Carma. They argue that the tape was inadmissible either as a prior inconsistent statement or under the residual exception to the hearsay rule. Fed.R.Evid. 801(d)(1); 803(24).
 
 
 17
 The government concedes that the tape was not admissible as substantive evidence, but contends that it was offered to impeach Brandon's recantation. The videotape could properly be used for impeachment.[4] See United States v. Higa, 55 F.3d 448, 452 (9th Cir.1995) (impeachment by prior inconsistent statement is proper).
 
 
 18
 Ronald correctly notes that the court should have instructed the jury to consider the videotape only for impeachment purposes, United States v. Tafollo-Cardenas, 897 F.2d 976, 980 (9th Cir.1990), but none of the defendants asked for a limiting instruction. We review for plain error the court's failure to give such an instruction sua sponte. Fed.R.Crim.P. 52(b); United States v. Armijo, 5 F.3d 1229, 1232-33 (9th Cir.1993).
 
 
 19
 We first consider whether there has been an error, and whether it is plain. United States v. Olano, 113 S.Ct. 1770, 1777-78 (1993). An error is plain if it is "obvious." Id. at 1777. Although it was error to admit this testimony without a limiting instruction, we do not find the error was plain.[5] The need for a limiting instruction in these circumstances was not so glaring that the court was "derelict in countenancing it." See United States v. Muniz, 60 F.3d 65, 71 (2d Cir.1995) (quotation omitted). We note also that the prosecutor treated the videotape as impeachment evidence: he did not rely on it as substantive evidence in his closing argument, and the jury was not permitted to play the tape during deliberations.
 
 D. Violation of Expert Discovery Rules
 
 20
 The government violated the discovery provisions of Fed.R.Crim.P. 16(a)(1)(E) when it failed to provide the defense with summaries of the expert testimony it planned to present. Ronald and Carma argue that the court should have sanctioned the government by excluding the testimony. They also urge that the court's failure to release certain medical records pretrial prejudiced the defense. They contend that these failures require reversal.
 
 
 21
 At trial, the prosecutor maintained that he viewed the treating physicians and therapists as fact witnesses. But the court acknowledged at several points that the prosecutor had violated Rule 16 and was eliciting expert opinions from his "fact" witnesses. We must determine whether the court's failure to respond to these violations was an abuse of discretion. United States v. Peters, 937 F.2d 1422, 1424 (9th Cir.1991) (reviewing for abuse of discretion "the propriety of excluding evidence as a sanction").
 
 
 22
 A violation of Rule 16 does not in itself require reversal, or even exclusion of the affected testimony. United States v. Baker, 10 F.3d 1374, 1398 (9th Cir.1993). Ronald and Carma must demonstrate prejudice to substantial rights to justify reversal for violations of discovery rules. Id. "The prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules, not had the evidence been suppressed." Id. at 1398 n. 8. Ronald and Carma have not met their burden.
 
 
 23
 1. Failure to Provide Expert Opinion Summaries
 
 
 24
 Neither Ronald nor Carma make any specific showing of prejudice from the government's violation of the discovery rule. The court made the testifying treatment providers' notes available to the defendants as they testified, subpoenaed other records, and directed that they could be recalled after the defendants had reviewed the records. Despite this offer, the defendants did not recall any government witness and made no requests for additional time to prepare. See Baker, 10 F.3d at 1398 (finding no prejudice where court granted recesses and continuances to examine new evidence or prepare for unanticipated witnesses).
 
 
 25
 Ronald complains particularly that one witness, Dr. Sauer, a pediatrician who testified that Leonard's anus showed signs of repeated blunt trauma, should not have been allowed to testify. Ronald offers no explanation of how prior knowledge of this fact would have changed his trial strategy.
 
 
 26
 2. Failure to Provide Medical Records Prior to Trial
 
 
 27
 Nor do Ronald and Carma point to any specific prejudice from the court's failure to provide them with the medical witnesses' records pretrial. Carma notes she had "little opportunity ... to assess whether lines of inquiry should be pursued, or whether other expert witnesses of [her] own should be called or retained" for rebuttal, but does not describe any specific change in trial strategy she might have pursued. She does not explain how these speculative rebuttal witnesses might have affected the verdict. Ronald says only that the defense should have "been entitled to use information from the records to impeach the testimony of the boys and the doctors." It was.
 
 
 28
 No prejudice warranting reversal resulted from the court's decision not to impose evidentiary sanctions on the government for discovery violations.
 
 
 29
 E. Admissibility of Victims' Statements to Treatment Providers
 
 
 30
 Therapists who treated Stephen, Douglas and Leonard were permitted at trial to recount what the boys had told them in therapy about the abuse. Ronald and Carma argue that this testimony was inadmissible hearsay. After reviewing the relevant portions of the therapists' testimony, we find no abuse of discretion.
 
 
 31
 Each of the challenged statements, except one, discussed below, was made to a psychiatrist, psychologist or pediatrician.[6] There was ample testimony that these statements were made in the course of treatment.[7] They were admissible under the medical treatment exception to the hearsay rule. Fed.R.Evid. 803(4); United States v. George, 960 F.2d 97, 99 (9th Cir.1992).
 
 
 32
 While statements of fault generally do not fall within the purview of Rule 803(4), "[s]exual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." Id. The boys' identification of the defendants and their descriptions of the abuse "fall within the exception because they pertain to the 'cause or external source' of the injury and because they are 'pertinent to diagnosis or treatment.' " Guam v. Ignacio, 10 F.3d 608, 613 (9th Cir.1992), quoting Rule 803(4).
 
 
 33
 Carma also challenges statements made to a social worker. We do not reach the question whether statements made to social workers fall within the ambit of 803(4) because we find any error in this regard harmless. See id. at 613-14 and n. 4. The statement was only one of many made to treatment providers on the same subject. The boys themselves testified about the abuse. The evidence was cumulative and any error was more probably than not harmless. Id. at 614.
 
 
 34
 F. Treatment Providers Vouching for Victim/Witnesses
 
 
 35
 Two government witnesses, Dr. Page and Dr. Baxter, testified as to whether their patients' accounts of abuse were credible. Ronald argues that this testimony amounted to impermissible vouching. Admission of expert testimony is reviewed for abuse of discretion. United States v. Binder, 769 F.2d 595, 601 (9th Cir.1985).
 
 
 36
 Ronald is correct that experts should not be "permitted to testify specifically to a witness' credibility." United States v. Candoli, 870 F.2d 496, 506 (9th Cir.1989), but the admission of Dr. Page's comment, even if an abuse of discretion, was harmless error. Id. The testimony was confusing, and there was abundant evidence that Leonard had been abused, including his own testimony, his accounts during treatment of abuse, his behavior, and physical evidence of trauma.
 
 
 37
 Dr. Baxter's testimony is on a different footing. In response to questions from counsel for Lolita Butterfly Dayrider,[8] defense witness Dr. Bilberry testified extensively that he found Brandon's stories of abuse unbelievable. No one objected. In response, the government elicited from Dr. Baxter a tentative conclusion that Brandon suffered "some type of sexual abuse" and that his account of abuse "seemed quite compelling." This testimony became appropriate once the defense "opened the door." See, e.g., United States v. Rivera, 43 F.3d 1291, 1295 (9th Cir.1995) (defense opened door to testimony of doctor endorsing victim's charge of rape when it tried to demonstrate on cross-examination that victim had "fooled" doctor).
 
 G. Sufficiency of the Evidence
 
 38
 Ronald and Carma argue that the evidence was insufficient to convict them. We reject this argument because, viewing the evidence in the light most favorable to the government, we find that a rational trier of fact could have found the essential elements of each of the crimes beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 39
 This argument rests primarily on the children's alleged incompetence, an issue we have settled. Douglas, Stephen and Leonard each testified that Carma and Ronald sexually abused them. Their therapists testified to the same effect. Brandon did not testify in court to any specific episodes that would support a conviction, but after the videotaped interview was played in court, Brandon said that he was not lying during that interview, and that he had lied in court because he was mad. In addition, a psychologist who evaluated Brandon related the account of abuse he had given during their session. Viewed in the light most favorable to the government, this evidence would support the convictions.
 
 H. Improper Closing Argument
 
 40
 Carma's unsupported contention that the prosecutor engaged in improper closing argument is meritless. See United States v. Williams, 990 F.2d 507, 510 (9th Cir.1993) (prosecutor may reply to arguments made by defense counsel, as long as the comment does not call attention to defendant's failure to testify); see also United States v. Vaandering, 50 F.3d 696, 701-02 (9th Cir.1995) (comments intended to highlight weaknesses in defendant's case do not shift burden of proof where prosecutor reiterates burden of proof and does not argue that a failure to explain them adequately requires guilty verdict).
 
 
 41
 I. Enhancement for Use of Physical Restraint
 
 
 42
 The court increased Carma's sentence by two levels because Leonard and Stephen were physically restrained in the course of the crimes. U.S.S.G. Sec. 3A1.3. She argues that there is no evidence that she, as opposed to Ronald, restrained either child, and she timely objected to the presentence report. We review de novo the court's application of the sentencing guidelines. United States v. Navarro, 979 F.2d 786, 787 (9th Cir.1992).
 
 
 43
 When a defendant alleges factual inaccuracy in the presentence report the court must make a finding "as to each matter controverted," and append these findings to the presentence report. Fed.R.Crim.P. 32(b)(3)(D). "Strict compliance with the Rule is required." United States v. Fernandez-Angulo, 897 F.2d 1514, 1516 (9th Cir.1990) (en banc). If the district court fails to comply, the sentence must be vacated. Id.
 
 
 44
 Here, the court made a general finding at the sentencing hearing: "I reject the idea that there was no tying and that." But at that point, it was considering Ronald's sentence; it made no specific finding regarding Carma's behavior or her participation in tying the victims. The court never expressly adopted the findings of the presentence report. Navarro, 979 F.2d at 789 (adoption of the presentence report satisfies Rule 32 if the presentence report is supported by facts or the guidelines). In the absence of a specific finding that Carma participated in restraining the boys, we vacate Carma's sentence and remand for resentencing.
 
 CONCLUSION
 
 45
 Ronald and Carma's convictions are affirmed. Carma's sentence is vacated and her case is remanded for resentencing. On resentencing, if the court finds that an enhancement for use of restraint is appropriate, it should enter findings supporting that conclusion.
 
 
 46
 AFFIRMED in part; VACATED in part and REMANDED.
 
 CANBY, Circuit Judge, dissenting:
 
 47
 I dissent from the majority's judgment in two respects. First, I conclude that it was plain error for the court not to instruct the jury that they could consider Brandon's videotaped statement only for impeachment purposes. As the majority's memorandum indicates, the videotape was admissible at best only as a prior inconsistent statement. The statement was unsworn, and was taken for purposes of substantiating claims of abuse. It therefore lacked the "guarantees of trustworthiness" required to qualify for admission under the residual clause of Fed.R.Evid. 803(24). See Webb v. Lewis, 44 F.3d 1387, 1390-93 (9th Cir.1994) (amended opinion) (statement taken by social worker trained to elicit descriptions of sexual abuse inadmissible as hearsay lacking guarantees of trustworthiness) cert. denied, 115 S.Ct. 2002 (1995); see also Idaho v. Wright, 497 U.S. 805, 826-27 (1990).
 
 
 48
 Accordingly, the statement was admissible, if at all, for impeachment purposes under Fed.R.Evid. 613(b). "[T]he maximum legitimate effect of the impeaching testimony can never be more than the cancellation" of the contradicted testimony. United States v. Cunningham, 446 F.2d 194, 197 (2d Cir.), cert. denied, 404 U.S. 950 (1971) (internal quotes omitted). The jury was not so informed, and the defendants failed to request a limiting instruction. In proper circumstances, however, the failure to give such an instruction may constitute plain error, requiring reversal even in the absence of a proper objection or request for limiting instructions. United States v. Ragghianti, 560 F.2d 1376, 1380-81 (9th Cir.1977). Here the error was "plain" in the sense of being clear or obvious. See United States v. Olano, 113 S.Ct. 1770, 1777 (1993). We therefore should reverse if the error "affect[ed] substantial rights," id. at 1778 (quoting Fed.R.Crim.P. 52(b)), and "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " Id. at 1779 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). In this case, both criteria are met.
 
 
 49
 Brandon was at best a marginally competent witness. It is undisputed that Brandon, like the other alleged victims, suffered from fetal alcohol effect, and that this condition often makes it difficult for its victims to separate fact from fantasy--that is, to know what is true. Brandon's therapist testified that Brandon did not know whether his stories of abuse were true or false. The defense offered to prove that Brandon had been diagnosed as retarded.
 
 
 50
 Brandon's testimony, as the majority memorandum indicates, was self-contradictory, not only on the question of Brandon's duty to tell the truth, but on the questions whether the alleged sexual abuse ever occurred and whether Brandon had lied in his videotaped statement. His testimony, standing alone and unaided by his videotaped statement, would very likely be found by a rational trier of fact to be insufficient to convict Ronald. It would be insufficient as a matter of law to support a conviction of Carma, because Brandon's testimony (unlike his videotaped statement) does not discuss Carma. So far as Brandon's testimony is concerned, therefore, the admission of the statement as substantive evidence clearly affected the defendants' substantial rights. Brandon's testimony without the statement was essentially worthless.
 
 
 51
 The remainder of the evidence in this case leads to the conclusion that the admission of Brandon's statement affected the fairness of the entire trial. The government's case depended almost entirely on the mutually-supporting stories of the four alleged victims, and their relation of these stories to therapists.[1] Brandon's statement unquestionably had both direct and spill-over effects on the rest of the case. The testimony of the other boys raised, to put it mildly, extreme questions of credibility. Some of the episodes described as truth were clearly fantastic; four separate murders were related (with two bodies disposed of by throwing them in trash cans) that have never been substantiated in any manner. Other events related by the alleged victims were improbable and contradicted by other uninvolved witnesses. The jury had a delicate task of determining whether all or just some of the victims' testimony was delusional. Indeed, the jury apparently disbelieved much or all of the testimony implicating the victims' mother, because they acquitted her. On this record, it is impossible to conclude that the error in admitting Brandon's videotaped interview did not seriously affect the fairness or integrity of all of the convictions.[2]
 
 
 52
 My second disagreement with the majority decision concerns the competency of Ronald Butterfly to stand trial. I conclude that the district court clearly erred in finding him competent.
 
 
 53
 The test for competency of a defendant to stand trial is " 'whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him.' " Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam) (quoting Solicitor General) (emphasis added). A defendant "whose mental condition is such that he lacks the capacity ... to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975).
 
 
 54
 The government's expert psychologist testified that Butterfly's mental retardation would not "substantially interfere with his ability to assist his counsel at trial," but his description of Butterfly's abilities undermines that judgment. He acknowledged that Butterfly's impairment would have an impact, "[but] nevertheless, I think it's very possible, very likely that he can understand what's going on around him, especially if his lawyer doesn't use fancy words." On cross-examination, however, the government expert explained that Butterfly's ability to abstract was severely compromised. Further questioning included the following exchanges:
 
 
 55
 Q. Wouldn't those limited abstraction abilities affect his ability to assist me during trial? For example, when he heard a witness testify, being able to absorb that knowledge and analyze it?
 
 
 56
 A. Yes, I think that's true. And I hope that I made clear in my report that he will very much depend on his attorney to do some of his interpretation for him. But he will understand what is being said, will understand the facts, let's say, for the content of what the person is saying.
 
 
 57
 I think that he will be very much compromised in being able to sit back and reflect about that and interpret or give all sorts of reasons why somebody would say it if it was untrue or distorted.
 
 
 58
 And in that way, he will not be of any assistance to you at all.
 
 
 59
 ....
 
 
 60
 Q. Do you think he has any ability to assist me in understanding or analyzing the family dynamics, that is the relationship he has with the other members of the family, and in particular the four nephews who have accused him of a crime?
 
 
 61
 A. I don't think he can give you much help there at all. I think that's a particular limit of his ability to assist you that he simply doesn't have the reasoning capacity to figure out why somebody would tell these lies about him.
 
 
 62
 I am talking in terms of what he has said to me. "I can't figure it out. I don't know why they would tell these lies about us." And he's not really able to sit down and speculate as to what might be happening.
 
 
 63
 I think that's directly a cause of his mental retardation. That's not something he can be trained to do.
 
 
 64
 The defense's expert psychologist, who concluded that Butterfly was not competent to stand trial, viewed Butterfly's disabilities as being more incapacitating than did the government's expert, in five ways:
 
 
 65
 The first is his ability to disclose pertinent information to you, his ability to relate factual information that might be helpful in defending him or helping you develop a defense for him.
 
 
 66
 I also think that his ability to follow the proceedings in the courtroom to a reasonable [degree] that would allow him to hem in his sense is severely compromised and I don't think he can do that.
 
 
 67
 I don't think he can testify if you felt he needed to.
 
 
 68
 And I don't feel that he has the ability to follow what a witness is saying about him other than the idea that [the government expert] described of thinking that person is lying.
 
 
 69
 But being able to follow a sequence of events that a witness may describe, and then tell you, "No, that part is wrong because this was happening and that part is not happening because I was over in the bathroom" or, you know, "I wasn't even present."
 
 
 70
 The trial judge, who recognized that the issue of competency was a close one, found the government's expert more convincing than the defense's expert. But even the government's expert acknowledged severe deficiencies in Butterfly's ability to assist in his own defense. Butterfly, according to the government's expert, can understand the "content" of a witness's testimony, but will be unable to tell his counsel why the testimony is incorrect or distorted. Under the standards announced by the Supreme Court, that level of understanding is insufficient. The defendant must have " 'a rational as well as factual understanding of the proceedings against him.' " Dusky, 362 U.S. at 402 (quoting Solicitor-General). As I interpret that standard, it is insufficient that a defendant is aware that someone is testifying against him; he must be capable of rational evaluation of that testimony. A defendant who cannot reason about the testimony should not stand trial.
 
 
 71
 The Supreme Court has recently pointed out the decisions that face a defendant on trial:
 
 
 72
 A defendant who stands trial is likely to be presented with choices that entail relinquishment of the same rights that are relinquished by a defendant who pleads guilty: He will ordinarily have to decide whether to waive his "privilege against compulsory self-incrimination," by taking the witness stand; if the option is available, he may have to decide whether to waive his "right to trial by jury," and, in consultation with counsel, he may have to decide whether to waive his "right to confront [his] accusers," ... by declining to cross-examine witnesses for the prosecution. A defendant who pleads not guilty, moreover, faces still other strategic choices: In consultation with his attorney, he may be called upon to decide, among other things, whether (and how) to put on a defense and whether to raise one or more affirmative defenses. In sum, all criminal defendants--not merely those who plead guilty--may be required to make important decisions once criminal proceedings have been initiated.
 
 
 73
 Godinez v. Moran, 113 S.Ct. 2680, 2686 (1993) (citations omitted). The expert testimony in this case, viewed in the light most favorable to the prosecution, leaves no doubt that Ronald Butterfly was unable to make such decisions, or rationally to assist his counsel in making them. See United States v. Hoskie, 950 F.2d 1388, 1392-94 (9th Cir.1991).
 
 
 74
 It is true that the experienced trial judge in this case had the opportunity to observe Butterfly during the trial, but that opportunity was limited by the fact that Butterfly did not testify. On this record, I am left with a definite and firm conviction that Butterfly was not competent to be tried; the district court clearly erred in finding to the contrary.
 
 
 75
 I would therefore reverse Ronald Butterfly's convictions and remand for further appropriate proceedings regarding his competency. See Hoskie, 950 F.2d at 1395.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Ronald points out that in its order finding Ronald competent, the court misstated the legal standard it was to apply. The order said, "The evidence presented relevant to the competency of Butterfly to stand trial, when viewed in the light most favorable to the government, convinces the court that the government has sustained its burden in establishing that Butterfly" is competent
 It appears from the record that the court did not actually view the evidence this way, and that its reference to the "light most favorable" standard was an oversight. The court noted that the government had the burden of demonstrating competence by a preponderance of the evidence. It correctly cited 18 U.S.C. Sec. 2241(d) and United States v. Dusky as setting the legal standard for finding incompetency. It correctly noted that the burden was on the government to show competency. It "exhaustively" considered the testimony of both doctors. If the court had in fact viewed the evidence in the light most favorable to the government, its determination would have been easy: any direct conflict between the two doctors would necessarily have been resolved in favor of the government. We find that despite its misstatement, the court applied the correct legal standard in this case.
 
 
 [2]
 Despite the court's assurances that it would be sensitive to Ronald's needs for breaks, it does not appear that the defense ever requested a break or made any record that Ronald was having difficulty following the proceedings
 
 
 [3]
 The district court in Hoskie at several points expressed doubts about Hoskie's competence, and at times intimated that its determination of competence was based on Hoskie's dangerousness rather than on his mental state. Hoskie, 950 F.2d at 1391. Judge Hatfield expressed no doubts about Ronald's competence and never suggested that he believed Ronald to be dangerous
 In addition, the government expert's conclusion of competence in Hoskie "rested in significant part on his observations of Hoskie's ability to function" in the very limited sphere of his daily activities. We found this ability irrelevant to whether Hoskie understood the trial process. Id. at 1394. Because Dr. Frederick's conclusion of competency was not based on any improper considerations, the court was entitled to accord it more weight than Dr. Scolatti's opposite conclusion. Cf. id. at 1394.
 
 
 [4]
 Ronald also argues that there was no basis for introducing the inconsistent statement where Brandon testified that he did not remember making the statement. He did not object on these grounds at trial. It was not plain error to admit the tape in these circumstances. See United States v. Billue, 994 F.2d 1562, 1566 (11th Cir.1993) (if witness fails to remember making prior inconsistent statement, statement may be introduced as impeachment, citing United States v. Williamson, 310 F.2d 192, 199 (9th Cir.1962)). Ronald cites cases contrary to Billue, but at most they show that the law is not clear on this point. Where the law is not settled there can be no plain error. See United States v. Olano, 113 S.Ct. 1770, 1777 (1993)
 
 
 [5]
 Dictum in Armijo, 5 F.3d at 1233, suggests that a failure to provide a limiting instruction on impeachment evidence is always plain error. We decline to adopt this "per se" approach
 
 
 [6]
 See RT 172 (Douglas mentioned molestation to pediatrician); RT 193-97, 201 (Leonard and Stephen during treatment sessions with clinical psychologist recounted sexual contact with an uncle, Brandon, Carma and their mother); RT 334-35 (Douglas's psychiatrist testified to Douglas's account in treatment of sexual abuse by Ronald and Carma); RT 484-85 (Leonard's psychologist testified to Leonard's description during treatment sessions of abuse by his mother and Ronald); RT 581 (Stephen's psychiatrist testified that in the course of treatment Stephen recounted abuse by his mother, Ronald and Carma)
 
 
 [7]
 See RT 172 (Douglas mentioned molestation "as part of his history"); RT 333 (Douglas's psychiatrist emphasized importance of developing sexual abuse history to determine what triggers fears or outbursts in child sex offenders); RT 483-86 (Leonard's psychologist testified that Leonard's fears of Ronald were "clinically significant" and that it is important in treatment to elicit what is causing the child to be fearful); RT 580 (Stephen's psychiatrist testified that he elicited sexual abuse history because in diagnosing posttraumatic stress disorder it is important to ascertain what the child has perceived as the traumatic experience)
 
 
 [8]
 Ms. Dayrider, the victims' mother and appellants' sister, was also tried for aggravated sexual abuse of the four boys. The jury acquitted her
 
 
 [1]
 Although the boys were never physically examined for the purposes of determining whether they had been abused, one pediatrician testified that one of the younger boys had anal scars consistent with abuse. He could not tell how old the scars were. It is undisputed, however, that at the time the boys entered therapy, one or both of the two older boys were abusing the younger ones
 
 
 [2]
 Another cause for concern in this case is the government's failure to provide summaries of expert witness testimony to the defense as required by Fed.R.Crim.P. 16(a)(1)(E). Although no continuances were requested on that ground, the defense did vigorously object to receipt of the testimony, which played a large part in the trial. The lack of such statements is likely to have hampered the defendants to some degree in preparing for trial