RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0119P (6th Cir.)
File Name: 03a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GERALD MCKENZIE,
        *Petitioner-Appellant,*

        *v.*                                        No. 01-1824

DAVID SMITH, Warden,
        *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-70316—Avern Cohn, Senior District Judge.

Argued: September 17, 2002

Decided and Filed: April 23, 2003

Before: SILER, DAUGHTREY, and GILMAN, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Nancy L. McGunn, FEDERAL PUBLIC
DEFENDERS OFFICE, Detroit, Michigan, for Appellant.
Raina I. Korbakis, STATE OF MICHIGAN, DEPARTMENT
OF ATTORNEY GENERAL, Lansing, Michigan, for
Appellee. **ON BRIEF:** Nancy L. McGunn, Andrew N. Wise,
FEDERAL PUBLIC DEFENDERS OFFICE, Detroit,
Michigan, for Appellant. William C. Campbell, OFFICE OF

THE ATTORNEY GENERAL, HABEAS CORPUS
DIVISION, Lansing, Michigan, for Appellee.

———————————

**OPINION**

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The
petitioner, Gerald McKenzie, is a Michigan state prisoner
who was convicted of assault with intent to murder and, as a
result of that conviction, is serving a sentence of life
imprisonment. He appeals the district court's judgment
denying his petition for a writ of habeas corpus, filed under 28
U.S.C. § 2254. For the reasons set out below, we conclude
that the evidence introduced against McKenzie is
constitutionally insufficient to sustain his conviction, and we
therefore find it necessary to reverse the district court's denial
of relief.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1984, a Michigan jury found Gerald McKenzie guilty of
the attempted murder of his girlfriend's three-year-old
daughter, in violation of MCLA § 750.83. The evidence at
trial established that, in the early morning hours of March 7,
1984, a construction worker reporting for work in downtown
Detroit encountered a woman he had never seen before. The
woman, who was never identified, told the worker to enter a
nearby vacant building. He did so and found a three-year-old
girl lying unconscious on the floor of the unheated building.
Although the temperature that morning was as low as seven
degrees, the girl was dressed only in a T-shirt and overalls,
without a coat, socks or shoes. A pool of blood from her head
had frozen, sticking her face to the floor. The worker picked
up the child and took her out of the building. He then found
a police officer who took the child to the hospital.

When admitted to the hospital, the child, Quattura Sutton,
was in critical condition and experiencing severe
hypothermia. She had several severe bruises to her head that

were, according to the emergency room physician, new and suggestive of abuse. The doctor further testified that Quattura was emotionally traumatized and was in an "acutely deranged abnormal condition." He described Quattura as "withdrawn" and said that she "did not appear normal psychologically for several weeks."

Quattura lived with her mother, Elena Carter, and Carter's boyfriend, petitioner McKenzie, at the home of Carter's aunt, Patricia. Patricia and her two children, Tonya and Wilbert, also resided in the home, located around the corner from the vacant building in which Quattura was found. McKenzie and Carter had been dating for nearly three years and had been living together since Quattura was almost a year old. Both Carter and Carter's mother testified that although McKenzie was not Quattura's biological father, Quattura referred to him as "Daddy."

On the night of March 6, 1984, Carter and McKenzie spent the evening at home, both of them using drugs with a friend, Darrell Reed. They later walked Reed to the bus stop, returning home at 1:00 a.m. Carter testified that she told McKenzie she was going back out to borrow money to buy more drugs. McKenzie told Carter he was going to lie on the living room couch with Quattura. He said he would lock the door, and he told Carter that she should ring the doorbell when she returned. At the time, Patricia was upstairs in her bedroom, and her two children were on a couch in the dining room.

Carter admitted at trial that she had no intention of going out to get money that night. Rather, she intended to join another man, Johnny Williams, to do drugs. Carter said that she spent the remainder of the night with Williams and called her mother sometime after 11:00 a.m. on March 7, at which time she was told that Quattura was in the hospital.

After awakening on the morning of March 7, Patricia saw McKenzie sitting on the bed in the back bedroom and heard him making a crying noise. Patricia testified that McKenzie asked her if she had seen Quattura and told her that the child

was not in the house. Patricia went downstairs looking for Quattura, but could not find her. She noted that the door was unlocked. Around noon, Patricia received word that Quattura was in the hospital.

Patricia's nine-year-old son Wilbert testified that he woke up the morning of March 7 when he heard McKenzie come into the house through the front door. Wilbert stated that he saw McKenzie go up to his mother's bedroom and then into McKenzie's own bedroom, where he sat down and "ma[de] funny noises like he was crying."

Quattura's maternal grandmother, Juanita Horton, testified that she saw her granddaughter in the hospital at about 1:30 a.m. on March 8, the day after she was admitted. She described Quattura's condition as "drowsy" and said that the child was "in a lot of distress." Horton testified that she asked Quattura, "How is Grandma's baby?" Over a hearsay objection from McKenzie's lawyer, Horton testified that Quattura said, "See, Grandma, what my daddy did to me." The trial judge ruled that this statement qualified as an excited utterance and was therefore admissible as an exception to the hearsay rule. The parties had agreed that Quattura was not competent to testify, and she was not called as a witness at McKenzie's trial.

The parties stipulated that Quattura's hospital records contained a notation by a nurse who was present in the room around the same time and "had indicated she thought she heard [the child say] 'Donna,'" rather than "Daddy." However, the trial judge excluded evidence that Quattura, when asked two or three days later who had injured her, told the nurse, "Will did it." McKenzie's lawyer argued that the jury should be allowed to hear testimony concerning the "Will statement" because it was inconsistent with the "Daddy statement" introduced through testimony by Quattura's grandmother. The trial court, however, concluded that the statement "Will did it" was "not impeachment, as such," and excluded the evidence.

The state produced no physical evidence linking McKenzie to Quattura's assault. Lab technician Paula Lytle of the Detroit police department told the jury that she found Type O blood stains on a lamp shade taken from Quattura's home. According to Lytle, human blood of indeterminate type was also found at the foot of the staircase in the home. Lytle explained that her testing revealed that Quattura had Type O blood. Lytle further testified that her analysis of McKenzie's boots came up negative for blood stains. On cross-examination, Lytle also acknowledged that hair fibers found on Quattura at the hospital were found to be "dissimilar" to samples taken from McKenzie.

Also during the state's case-in-chief, Elena Carter testified that she was unaware of McKenzie having ever hit Quattura in the past. Juanita Horton and Aaron Horton, Quattura's grandparents, testified to the same effect. Patricia said that McKenzie and Carter had been having disagreements about Carter's leaving and staying out late. However, Carter denied arguing with McKenzie that night, and she testified that McKenzie "wasn't upset" with her when she left the house.

McKenzie did not testify at his trial – or present any evidence at all – but statements that he made to police on March 7 and 8 were introduced into evidence by the prosecution. In his statements, McKenzie denied harming Quattura or removing her from the house. McKenzie did admit to using drugs earlier in the evening. He also said that he slept that night in an upstairs bedroom, not on the couch with Quattura, and did not become aware of the child's absence until he went downstairs at about 6:30 a.m.

After deliberating for four hours over a two-day period, the jury informed the trial court that it was deadlocked. The trial court rejected the defense's request for a mistrial and delivered an *Allen* charge. About four hours later, the jury returned with a guilty verdict. Subsequently, the trial judge sentenced McKenzie to a term of life imprisonment.

Since then, McKenzie's post-trial litigation, from direct appeal to the instant petition, has been lengthy and complex.

### *Direct Appeal*

On direct appeal, McKenzie raised several issues: (1) that the *Allen* charge was unduly coercive; (2) that Quattura's statement to her grandmother was improperly admitted as an excited utterance; (3) that the trial court's application of the Michigan rules of evidence deprived him of due process and the right to confrontation; (4) that the prosecution's introduction of photographs of the injured child was unduly prejudicial; and (5) that his life sentence violated Michigan sentencing guidelines. In addition, McKenzie's appellate counsel included a one-sentence argument that McKenzie was denied the effective assistance of trial counsel. The Michigan Court of Appeals affirmed the sentence and conviction in an unpublished order, and the Michigan Supreme Court denied McKenzie's application for review of the second, third, and fourth issues.

### *First Habeas Corpus Petition*

In 1986, McKenzie filed a *pro se* petition for a writ of habeas corpus in federal court, contending that the state trial court misapplied Michigan law in admitting Quattura's statement to her grandmother, misapplied Michigan law in admitting the photographs of the victim, and made evidentiary rulings that deprived McKenzie of his Sixth Amendment right to confront witnesses against him. The district court concluded that the first two claims were not cognizable habeas claims because they concerned solely state law matters and that McKenzie failed to meet his burden with regard to the third. The district court denied the petition, and McKenzie did not appeal.

### *Delayed Application for Leave to Appeal*

Again acting *pro se*, McKenzie filed a delayed application for leave to appeal with the Michigan Court of Appeals. In his application, McKenzie raised five issues, including insufficiency of the evidence supporting his conviction. In June 1989, the Michigan Court of Appeals denied the

application, and the Michigan Supreme Court subsequently denied an identical application.

### Second Habeas Corpus Petition

McKenzie returned to federal court in 1990, filing a second *pro se* habeas petition that asserted the same five issues raised in his delayed application for leave to appeal. The district court dismissed the petition under the "abuse of the writ" doctrine, and we subsequently denied McKenzie's application for a certificate of probable cause to appeal.

### Motion for Relief from Judgment

McKenzie then filed a *pro se* motion for relief from judgment in the Michigan trial court in early 1995. In the motion, McKenzie argued that his state and federal constitutional rights were violated because "the prosecution failed to prove his guilt beyond a reasonable doubt and the only evidence submitted against him was an erroneously admitted third party hearsay statement," that he had been deprived of the effective assistance of trial and appellate counsel, and that the sentence imposed by the trial court was disproportionate and improper.

The state court ruled that McKenzie was not entitled to relief with respect to the first issue, which the court described as "the admission of a third party statement in evidence," because it "was previously raised on appeal and decided against the defendant by the Court of Appeals." The court therefore determined that the first claim was barred by Michigan Court Rule 6.508(D)(2), which precludes relief if a motion "alleges grounds for relief which were decided against the defendant in a prior appeal." With respect to the remaining two issues, the court ruled that McKenzie was barred from relief pursuant to Michigan's procedural default rule, Michigan Court Rule 6.508(D)(3). The court did, however, appoint McKenzie counsel for purposes of appeal.

Through appointed counsel, McKenzie filed a motion for reconsideration with the trial court with respect to his motion

for post-judgment relief. The court denied the motion, and the Michigan Court of Appeals and Michigan Supreme Court denied leave to appeal.

### Federal Habeas Corpus Petition

In June 1998, McKenzie asked this court for permission to file a successive habeas petition. Specifically, McKenzie wanted to present to the district court claims that (1) he had been deprived of the effective assistance of trial and appellate counsel and (2) there had been insufficient evidence to convict him. We ruled that, to avoid a potential miscarriage of justice, McKenzie's claims should go forward:

> Upon review, we conclude that the requirements contained in 28 U.S.C. § 2244 do not apply to this case, because applying these requirements would have an impermissible retroactive effect on McKenzie's conduct that predates the passage of the Antiterrorism and Effective Death Penalty Act of 1996 . . . , which enacted the current version of § 2244. Although McKenzie has filed two prior petitions, which m[ight] have rendered his proposed petition a successive or abusive petition, we conclude that McKenzie has facially met the gateway standard for permitting review of his claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 316-17 (1995). Thus, he is entitled to review of the merits of his two asserted claims.

*In re McKenzie*, No. 98-0157 (6th Cir. May 11, 1999) (citations omitted).

When the case reached the district court, the court denied the state's motion to dismiss, granted McKenzie's motion for appointment of counsel, and referred the petition to a magistrate judge. The magistrate judge held an evidentiary hearing, at which only McKenzie's trial counsel testified. Following the hearing, the magistrate judge issued a report and recommendation that the petition be denied. On the issue that we now find dispositive, insufficiency of the evidence,

the magistrate determined that "based upon Quattura's statement to her grandmother that the man she called 'daddy' had assaulted her and the additional circumstantial evidence presented by the prosecution to show opportunity, . . . sufficient evidence was presented such that a juror could have reasonably concluded that Petitioner was guilty of assault with intent to murder."

Overruling McKenzie's objections, the district court adopted the report and recommendation and denied McKenzie's petition. The district court agreed with the magistrate judge regarding the sufficiency of the evidence, noting that "[w]hile much of the evidence . . . was circumstantial," there was nevertheless sufficient evidence from which a reasonable juror could find McKenzie guilty beyond a reasonable doubt.

## ANALYSIS

### Standard of Review

McKenzie raised the sufficiency of the evidence claim in his motion for relief from judgment, filed with the trial court in 1994. In rejecting the motion, the trial court failed to address McKenzie's claim. Instead, the trial court held that the claim had already been raised and decided against the defendant by the Michigan Court of Appeals and dismissed the sufficiency claim under Michigan Court Rule 6.508(D)(2), which precludes relief on grounds "which were decided against the defendant in a prior appeal or proceeding." Our review of the record convinces us that the Michigan appellate court considered the admissibility of the evidence but not its sufficiency to support McKenzie's conviction.

In our sister circuits, federal claims are reviewed *de novo* when a state court fails to adjudicate the claim on the merits. *See Schoenberger v. Russell*, 290 F.3d 831, 839 (6th Cir. 2002) (Keith, J., concurring) (collecting cases). In our circuit, by contrast, existing precedent binds us to the strictures of 28 U.S.C. § 2254 even "when there is no state court decision articulating its reasons." *Harris v. Stovall*, 212 F.3d 940, 943

(6th Cir. 2000). In this instance, however, we believe that *Harris* is distinguishable. There, the state court issued a summary order granting the prosecutor's motion to affirm. *Id.* Although the court did not explain the basis for its reason, we can safely assume that the state court considered the merits of Harris's claim. Here, with regard to McKenzie's sufficiency claim, the trial court believed that the court of appeals had already considered the claim. However, as noted above, the Michigan appellate court addressed only the admissibility of the evidence, but never directly addressed the specific issue of whether the evidence was sufficient to support McKenzie's conviction. Accordingly, there are simply no results, let alone reasoning, to which this court can defer. Without such results or reasoning, any attempt to determine whether the state court decision "was contrary to, or involved an unreasonable application of clearly established Federal law," 28 U.S.C. § 2254(d)(1), would be futile. If deference to the state court is inapplicable or inappropriate, we "exercise our independent judgment" and review the claim *de novo*. *Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002); *see also Cox v. Miller*, 296 F.3d 89, 101 (2nd Cir. 2002) (noting that habeas claims are either subject to AEDPA standard or reviewed *de novo*); *Moore v. Parke*, 148 F.3d 705, 708 (7th Cir. 1998) (reviewing claim *de novo* once AEDPA deference found to be inappropriate).

### Sufficiency of the Evidence

In assessing whether there is sufficient evidence to support McKenzie's conviction, we must determine whether, after viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). It is the province of the fact-finder, not this court, to weigh the probative value of the evidence and resolve any conflicts in the testimony. *See i.d.* Furthermore, "circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Talley,* 194

F.3d 758, 765 (6th Cir. 1999). However, if the judgment is not supported by "substantial and competent evidence" upon the record as a whole, the judgment must be reversed. *See United States v. Khalil*, 279 F.3d 358, 368 (6th Cir. 2002).

At issue is whether the evidence was sufficient to establish, beyond a reasonable doubt, that McKenzie was the perpetrator of the assault. McKenzie argues that because "[t]here was neither physical evidence, nor eyewitness testimony, that in any way implicated [ ] McKenzie in the assault," no rational trier of fact could have found him guilty. The state counters that the child's hearsay statement to the effect that "Daddy did it," along with the evidence that McKenzie had the opportunity to commit the crime, is sufficient to support his conviction. The district court cited the child's hearsay statement in concluding that the state met its evidentiary burden.

The jury's reliance on Quattura's out-of-court statement is understandable. McKenzie was charged with a brutal assault on a three-year-old child who was badly injured and then abandoned in a vacant building, in a situation that was obviously life-threatening. However, it is in just these circumstances, when the crime itself is likely to inflame the passions of jurors, that courts must be vigilant in ensuring that the demands of due process are met.

We consider first the statement implicating McKenzie, evidence the state argues is sufficient to support the conviction. The parties stipulated that Quattura was not competent to testify during the trial. At the time of the assault, she was three years old. According to her doctor, Quattura was "somewhat withdrawn and did not appear normal psychologically" for several weeks after the assault. He described Quattura's condition as an "acutely deranged abnormal condition." According to Juanita Horton, Quattura was "drowsy" and "in a lot of distress" on the day the statement was made. Furthermore, a nurse in the room heard her say "Donna" rather than "Daddy."

Because this was an out-of-court statement and Quattura was deemed incompetent to testify, cross-examination was impossible. Given the age and mental state of Quattura and the conflicting versions of what she said, we find unwarranted the state's reliance on this statement, and virtually this statement alone, to support the petitioner's conviction. While such evidence could certainly be used to add to the prosecution's case, a statement made under circumstances such as those in this case by an "incompetent" declarant simply does not constitute proof beyond a reasonable doubt. *Cf. United States v. Orrico*, 599 F.2d 113 (6th Cir. 1979) (holding past recollection recorded and prior inconsistent statement insufficient, standing alone, to establish central element of alleged offense).

There was circumstantial evidence that suggested McKenzie was in the home and upset the morning Quattura was discovered to be missing. However, there were other people in the home on the morning Quattura was assaulted. Additionally, there was no physical evidence or eyewitness testimony linking McKenzie to the assault on Quattura. Family members testified that they had never seen McKenzie harm Quattura and could not imagine that he would.

We have grave doubts about the legitimacy of the state trial court's original determination that Quattura's out-of-court statement was admissible as an excited utterance, but that question is one of state law, not reviewable in a federal habeas action "unless [the error] so perniciously effect[ed] the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelley v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). Although this could potentially provide an alternative ground for granting the writ of habeas corpus, our resolution of the case on other grounds obviates the necessity for us to decide the question. We have, as well, substantial misgivings about trial counsel's failure to address the confrontation issues inherent in the trial court's decision to permit introduction of the "Daddy statement" while ruling inadmissible the "Will statement," but that federal constitutional question is also one we need not reach in view

of our ruling on the sufficiency of the convicting evidence. On that score, and given the circumstances of the child's out-of-court statement and the lack of any corroborating evidence, we hold – upon the record as a whole – that the petitioner's conviction is not supported by constitutionally sufficient evidence. Although we can understand why a jury would want to convict someone for the crime involved in this case, the proof is neither substantial nor competent enough to let stand the jury's verdict finding McKenzie guilty.

## *CONCLUSION*

For the reasons set out above, we REVERSE the judgment of the district court and REMAND the case with directions to the district judge to issue the writ of habeas corpus.