File Name: 06a0881n.06
Filed: December 7, 2006

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 05-4367**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES R. GASTON, | ) | |
| | ) | |
| Petitioner - Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF OHIO, |
| ANTHONY BRIGANO, | ) | EASTERN DIVISION |
| | ) | |
| Respondent - Appellant. | ) | |
| | ) | |

Before: GUY and SUTTON, and ALARCÓN, Circuit Judges.[*]

ALARCÓN, Circuit Judge. James R. Gaston was convicted in the Court of Common Pleas, Belmont County, Ohio of the attempted rape of a nine-year old girl and the rape of a seven-year old girl. In his direct appeal to the Ohio Court of Appeals for the Seventh Judicial District, he contended, *inter alia*, that the admission of an audio-tape of the seven-year old's out-of-court statement over his objection violated his right to confrontation under the Sixth Amendment of the United States Constitution.

The Ohio Court of Appeals did not consider Mr. Gaston's federal constitutional claims.

---

[*]The Honorable Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth Circuit.

No. 05-4367
*Gaston v. Brigano*

Instead, it ruled that the audio-taped statement was admissible under Ohio Rule of Evidence 807(A). The Ohio Supreme Court dismissed the appeal.

Mr. Gaston filed a state prisoner petition for habeas corpus against Anthony Brigano, the Warden of the Lebanon Correctional Institute in Lebanon, Ohio ("the State") pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Ohio. The District Court granted the petition, holding that the admission of the audio-tape violated Mr. Gaston's Sixth Amendment right to confrontation. The State has appealed from that judgment. We affirm because we conclude that Mr. Gaston's right to confrontation was impermissibly denied under the Supreme Court's interpretation of the Confrontation Clause in *Ohio v. Roberts*, 448 U.S. 56 (1980).

**I**

**A**

The evidence, viewed in the light most favorable to the State, reveals that Maxine Williams, Mr. Gaston's live-in companion, was the sister of K.B., the mother of L.B., the seven-year old child who was named as the rape victim in Count Two of the indictment. Ms. Williams was also a friend of Ms. E.W., the mother of D.M., the nine-year old alleged victim in Count One of the indictment. Ms. K.B. and Ms. E.W. were also friends. Ms. K.B.'s children and Ms. E.W.'s children met socially frequently before the alleged rapes.

Prior to June 15, 1998, Ms. Williams had an affair with Ms. E.W.'s husband. As a result,

Ms. E.W. had not spoken to Ms. Williams for two years. Ms. E.W. called Ms. Williams on June 12, 1998, to request that Mr. Gaston testify on her behalf at her trial in which she was accused of child endangerment resulting in the death of her twenty-month old son.

Mr. Gaston and Ms. Williams went to Ms. E.W.'s home on June 15, 1998, in response to her request. Ms. E.W. asked Ms. Williams to take her three children, including D.M., to the Gaston residence for the evening and deliver them to Barkcamp the following morning. Ms. Williams refused because she had to work that night.

Ms. Williams left E.W.'s residence later that evening in a separate vehicle to go work. Mr. Gaston called Ms. Williams at her workplace and told her Ms. E.W.'s children wanted to spend the night at their residence. Ms. Williams told him not to let them come over. She was concerned that Ms. E.W. was "up to something" because of Ms. Williams's affair with Ms. E.W.'s husband. Nevertheless, Mr. Gaston took D.M. and her brothers, C. and J.J., to his and Ms. Williams' residence to spend the night because they wanted to play Nintendo and eat pizza. After playing Nintendo, J.J. became tired and went to bed upstairs. D.M. fell asleep on the couch. Mr. Gaston told C. to go to bed upstairs. C. tried to get D.M. to go to bed upstairs, but Mr. Gaston told him that she could spend the night asleep on the couch. C. went upstairs but did not go to sleep.

Later, he came downstairs, because he heard his sister screaming. He observed that Mr. Gaston was lying naked on the couch with D.M. When C. yelled Mr. Gaston's name, he jumped up, put his clothes on, and threw D.M.'s clothes at her. The children began crying and told Mr. Gaston

- 3 -

they wanted to go home. At this time, Ms. Williams telephoned Mr. Gaston from her workplace. She heard D.M. complaining and "yelling she wanted to go home."

Mr. Gaston took the children home at 12:30 a.m. on June 16, 1998. Ms. J.M., D.M.'s grandmother, testified that the children were crying and hysterical when they got out of Mr. Gaston's car. When Ms. J.M. asked D.M. what was wrong, she replied: "Nothing, Grandma. I can't tell you. . . . [b]ecause if I tell you, he'll make sure my mommy goes to prison for the rest of her life." C. then stated: "I'll tell you what went on, Grandma." C. told his grandmother: "I caught him on top of my sissy. I hollered his name once and he didn't hear me. And I hollered his name again and he jumped off of her, ran across the room and put his clothes on, and threw hers at her."

Ms. J.M. testified that when she continued to ask her granddaughter what happened, she replied: "He touched me . . . [d]own below where he's not supposed to, Grandma." Ms. J.M. then called the Wheeling Police Department. Mr. Gaston left the area while the call was made to the police. Mr. Gaston was arrested some time after midnight on June 16, 1998. C. testified at trial that after the police left, his mother called K.B., L.B.'s mother.

D.M. was taken to the Martin's Ferry Police Department at the request of the Wheeling Island Police Department because that agency had jurisdiction over the incident. After making a report to the police, D.M. was taken to an emergency room for examination. Thereafter, D.M. was interrogated by Karen Holmes, a sexual assault specialist at Belmont County Children Services.

D.M. testified at the state trial that she went to Mr. Gaston's house with her two brothers because they were supposed to go swimming the next day. After her brothers went to bed, Mr. Gaston took off her shorts and underwear, licked his fingers, and stuck them inside of her vagina. Mr. Gaston told her that if she told anyone about his conduct, he would have her mother put in prison.

L.B. was taken to the police station on June 16, 1998. She was examined at a hospital to determine whether she had been raped or sexually abused. The examination revealed that her vagina had been injured as the result of a penetrating injury. An expert witness testified that these injuries "could have been five days old or it could have been five months old. . . . . [o]r five years even."

On the same day that L.B. was examined, Ms. Holmes told her, "that's a safety rule, you tell if somebody touches you [on your privates] . . . and then the policemen . . . make sure that it doesn't happen again and that you're all right." Ms. Holmes then told L.B. that she was taken to the hospital to "make sure that you're all right." L.B. replied: "Yeah. Um [D.M.] went to the doctors and Jimmy [Gaston] went to jail." During this interrogation, L.B. stated for the first time that, on one occasion, sometime during the summer after school was out, Mr. Gaston hurt her when he put his private parts between her legs. L.B. also told Ms. Holmes that Mr. Gaston told her that he would kill her family if she told anyone what he had done.

L.B.'s taped statement was introduced into evidence over objection. It was the only evidence that identified Mr. Gaston as the person who raped her. At trial, Mr. Gaston's counsel objected to

No. 05-4367
*Gaston v. Brigano*

the admissibility of L.B.'s taped statement on the ground that it violated Ohio Rule of Evidence

807(A). The District Court overruled the objection. The jury convicted Mr. Gaston of the lesser

included offense of the attempted rape of D.M., and the rape of L.B. He was sentenced to serve eight

years in prison for the attempted rape of D.M., and life in prison for the rape of L.B. The trial court

ordered the sentences to be served consecutively.

**B**

Mr. Gaston filed an appeal from the judgment of conviction on November 23, 1998[1]. Mr.

Gaston presented the following assignments of error for review.

FIRST ASSIGNMENT OF ERROR

> The trial court's admission into evidence of a child declarant's audio-taped statement denied appellant due process of law and the right to confront his accusers, in violation of Article I, Section 10 of the Ohio Constitution[2] and the Sixth and Fourteenth Amendments of the United States Constitution.

SECOND ASSIGNMENT OF ERROR

> The trial court's exclusion of relevant evidence violated Evid. R. 404 (B) and denied appellant his right to present a defense.

---

[1]He was represented by separate counsel on appeal.

[2]Article I, Section 10 provides that "[i]n any trial, in any court, the party accused shall be allowed. . . to meet the witnesses face to face. . . ."

No. 05-4367
*Gaston v. Brigano*

THIRD ASSIGNMENT OF ERROR

The trial court erred in instructing the jury on the lesser included offense of attempted rape.

Merit Brief of Defendant-Appellant James R. Gaston at vi, *State v. Gaston*, No. 98-BA-52, 2001 WL 1647295 (Ohio Ct. App. Dec. 17, 2001) (brief before the Court of Appeals, Belmont County, Ohio Seventh Appellate District ("Ohio Court of Appeals")).

Mr. Gaston argued in support of his federal constitutional claim as follows:

[L.B.]'s taped statement did not meet the criteria articulated in [*Ohio v. Roberts*, 448 U.S. 56, 66 (1980)]. The statement did not fall within a firmly rooted hearsay exception. Nor did the statement bear adequate indicia of reliability. Indeed, [L.B.]'s statement is virtually identical to the statements that the United States Supreme Court found to be unconstitutionally admitted in *Idaho v. Wright* (1990), 497 U.S. 805, 110 S.Ct. 3139, 111 L. Ed. 2d 638.

*Id*. at 9 (internal citation omitted).

Mr. Gaston also stated in his brief before the Ohio Court of Appeals that "[t]he trial court's errors violated state evidentiary rules as well as Mr. Gaston's constitutional rights to due process and to confront his accusers." *Id*. at 14. Mr. Gaston did not set forth Ohio Rule of Evidence 807(A) in his Table of Authorities, nor did he discuss it in his argument regarding his first assignment of error. In the appendix to the brief he filed in the Ohio Court of Appeals, Mr. Gaston set forth and quoted Ohio Rule of Evidence 404 ("Character Evidence Not Admissible To Prove Conduct; Exceptions;

- 7 -

Other Crimes"), 405 ("Methods of Proving Character"), 601 ("General Rule of Competency"), and

608 ("Evidence of Character and Conduct of Witness"). Ohio Rule of Evidence 807(A) was not set

forth or quoted in Mr. Gaston's appendix. *Id*. at 14-1.

## II

The Ohio Court of Appeals affirmed Mr. Gaston's conviction. The Court summarized Mr.

Gaston's claim that the audio-tape of L.B.'s taped statement was inadmissible as follows: "Appellant

also asserts that by admitting [L.B.]'s interview into evidence, the court denied him of his Sixth

Amendment right to confront witnesses against him." *State v. Gaston*, No. 98-BA-52, 2001 WL

1647295, at *6 (Ohio Ct. App. Dec. 17, 2001). The Court further stated, "He claims that [L.B.]'s

statement was hearsay not within any recognized exception." *Id.* at *6.

The Ohio Court of Appeals did not consider whether, as a matter of law, the admission of

L.B.'s taped statement without permitting Mr. Gaston to face her at his trial violated his rights under

the Ohio or United States Constitutions. Instead, it held that, "[a]s to whether the [trial] court

properly admitted [L.B.]'s taped interview into evidence, *we must look to the rules of evidence*."

*Gaston*, 2001 WL 1647295, at *7 (emphasis added).

The Court then noted that "[Ohio Rule of Evidence] 807(A) provides that an out of-court

statement made by a child under twelve years of age describing a sexual act performed with the child

is not excluded as hearsay as long as certain prerequisites are met." *Gaston*, 2001 WL 1647295, at

No. 05-4367
*Gaston v. Brigano*

*7.[3] The Ohio Court of Appeals applied the abuse of discretion standard of review in determining whether the taped statement was admissible. The Court stated: "The admission or exclusion of evidence rests in the sound discretion of the trial court. This court will not reverse a trial court's

---

[3]Ohio Rule of Evidence 807(A) provides:

An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid. R. 802 if all of the following apply:

(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid. R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.

(2) The child's testimony is not reasonably obtainable by the proponent of the statement.

(3) There is independent proof of the sexual act or act of physical violence.

(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

- 9 -

decision on the admission or exclusion of evidence absent an abuse of discretion." *Id.* at *8 (internal citation omitted).

The Ohio Court of Appeals held that "[i]n this case [L.B.]'s taped interview met the mandates of Evid.R. 807." *Gaston*, 2001 WL 1647295, at *8. In reaching its conclusion, the Ohio Court of Appeals did not cite nor discuss any decision of the Ohio Supreme Court or the United States Supreme Court that considered whether the admission of a hearsay statement of a person under twelve years of age who was not subjected to cross-examination violated a defendant's right to confrontation. The only case cited by the Ohio Court of Appeals in its analysis of the admissibility of L.B.'s taped statement was *State v. Sage*, 31 Ohio St. 3d 173 (1987). The issue before the Supreme Court in *Sage* was whether a witness's testimony was admissible because it was relevant, as that term is defined in Ohio Rule of Evidence 401. *Sage*, 31 Ohio St. 3d at 180. The Appellant in *Sage* did not challenge the admissibility of the testimony on state or federal constitutional grounds. The Ohio Supreme Court concluded in *Sage* that the trial court did not abuse its discretion in admitting the testimony. *Sage*, 31 Ohio St. 3d at 182.

In this matter, the Ohio Court of Appeals, relying on the *Sage* decision, limited its review to the question whether the trial court abused its discretion in concluding that the taped statement was admissible pursuant to Ohio Rule of Evidence 807(A). The Ohio Court of Appeals clearly acknowledged that Mr. Gaston had contended in his appeal that the trial court denied him his Sixth Amendment right to confrontation by admitting L.B.'s taped statement. It failed to explain why it

No. 05-4367
*Gaston v. Brigano*

applied the abuse of discretion standard of review, however, instead of considering this issue as a

pure question of law subject to *de novo* review pursuant to Ohio jurisprudence.

Mr. Gaston filed a memorandum in support of jurisdiction before the Supreme Court of Ohio

in which he requested that it review the trial court's judgment[4]. He alleged, *inter alia*, that "[t]he

trial court's admission of the taped statement violated Ohio's evidentiary rules and Gaston's state

and federal constitutional right to confront the witnesses against him." Memorandum In Support of

Jurisdiction of Defendant-Appellant James R. Gaston at 6, *State v. Gaston*, No. 2002-0171 (Ohio

April 17, 2002).

The Supreme Court of Ohio dismissed the appeal on April 17, 2002. Its entire dispositive

order reads as follows: "Upon consideration of the jurisdictional memoranda filed in this case, the

Court denies leave to appeal and dismisses the appeal as not involving any substantial constitutional

question." Entry, *State v. Gaston,* No. 2002-0171 (Ohio April 17, 2002). The Ohio Supreme Court

did not cite any state or federal authority to support its terse conclusion that Mr. Gaston failed to

present a substantial constitutional question in his memorandum in support of jurisdiction. *Id.*

---

[4]Rule II, Section 1 (A)(3) of the Ohio Rules of Court, Rules of Practice of the Supreme Court of Ohio, provides: "[a]n appeal that involves a felony or a question of public or great general interest invokes the discretionary jurisdiction of the Supreme Court and shall be designated a discretionary appeal. In accordance with S. Ct. Prac. R. III, the Supreme Court will determine whether to accept the appeal." Pursuant to Rule II, Section 2 (A) (1) (a), "[i]f the appeal is a claimed appeal of right or a discretionary appeal, the appellant shall also file a memorandum in support of jurisdiction, in accordance with S. Ct. Prac. R. III, at the time the notice of appeal is filed."

- 11 -

No. 05-4367
*Gaston v. Brigano*

Mr. Gaston filed a petition for certiorari in the United States Supreme Court. It was denied on November 12, 2002.

**III**

On November 12, 2003, Mr. Gaston filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) in the United States District Court for the Southern District of Ohio, Eastern Division. He alleged, *inter alia,* that "[a]dmission of a child's taped statement as well [as] the child's other hearsay statements at Petitioner's trial violated Petitioner's right to confront his accuser in violation of the Sixth and Fourteenth Amendments to the United States Constitution." Petitioner James R. Gaston's Traverse To Respondent's Return of Writ at 3, *Gaston v. Brigano*, No. 03-1043 (S.D. Ohio Jan. 28, 2004).

After reviewing the trial record, the audio-tape of L.B.'s statement to Ms. Holmes, and the transcription of the tape, Magistrate Judge Terrence P. Kemp concluded in his Report and Recommendation that the admission of this evidence violated Mr. Gaston's right to confrontation. Report and Recommendation, *Gaston v. Brigano*, No. C-2-03-1043, 30-34 (S.D. Ohio Oct. 7, 2004). Accordingly, Magistrate Judge Kemp recommended that the application for a writ of habeas corpus be conditionally granted as to Mr. Gaston's federal constitutional claim, and that the conviction of the crime charged in Count Two of the indictment be vacated. *Id.* at 34-35.

After reviewing Magistrate Judge Kemp's Report and Recommendation, and the entire record in this case, the District Court adopted the recommendation on November 19, 2004, and stated that the "admission of [L.B.]'s audio-taped statements to Karen Holmes of Belmont County Children [sic] Services violated petitioner's right to confront the witnesses against him under the Sixth Amendment to the United States Constitution." Opinion and Order, *Gaston v. Brigano*, No. C-2-03-1043 at 6 (S.D. Ohio Nov. 19, 2004). The District Court rejected the State's argument that it was required to apply a deferential standard of review to the state trial court's basis for admitting L.B.'s taped statement. *Id.* at 5-6. The District Court held that the Ohio Court of Appeals had failed to address Mr. Gaston's federal constitutional claims in affirming the judgment. *Id.* at 5. The District Court concluded that, under Sixth Circuit law, "where the state court fails to address a petitioner's federal constitutional claim, a federal habeas court may review the claim *de novo*." *Id.* at 2. The District Court conditionally granted Mr. Gaston's constitutional claim and vacated the conviction on the rape charge alleged in Count Two of the indictment. *Id.* at 6.

## IV

The State filed a notice of appeal on December 17, 2004 from the final order of the District Court conditionally granting Mr. Gaston's petition for a writ of habeas corpus and vacating his conviction for raping L.B. In support of its appeal, the State argued that the Ohio Court of Appeals' rejection of Mr. Gaston's confrontation clause claim was neither contrary to clearly established United States Supreme Court precedent nor based on an unreasonable determination of the facts in

the light of the evidence presented. The State also contends that the District Court erred in applying a *de novo* standard of review to the question whether the Ohio Court of Appeals erred in holding that L.B.'s taped statements were admissible.

**A**

Before addressing these contentions, we must determine whether the District Court was barred from considering Mr. Gaston's application for a writ of habeas corpus because the Ohio Court of Appeals concluded that L.B.'s taped statement was admissible pursuant to Ohio Rule of Evidence 807(A), a state law ground, without ruling on the federal constitutional claim presented in Mr. Gaston's brief to the Ohio Court of Appeals. A state prisoner's application for a writ of habeas corpus may be granted only if "it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . ." 28 U.S.C. §2254(b)(1). "Although the parties did not raise [the exhaustion] issue on appeal, it may not be waived or conceded, and may be raised by this Court *sua sponte*." *Harris v. Rees*, 794 F.2d 1168, 1170 (6th Cir. 1986).

The exhaustion requirement is satisfied when "state prisoners give state courts a *fair* opportunity to act on their claims." *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis in original). Although Mr. Gaston presented his Confrontation Clause claim to the Ohio Court of Appeals, the Court of Appeals ignored it. Instead, the Ohio Court of Appeals concluded that it was required to look to Ohio's rules of evidence to determine whether the trial court properly admitted L.B.'s taped interview. *Gaston*, 2001 WL 1647295, at *6-8. The United States Supreme Court

instructed in *Smith v. Digmon*, 434 U.S. 332 (1978) that "[i]t is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U. S. C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court . . . ." *Id*. at 333. Because Mr. Gaston gave the Ohio Court of Appeals a fair opportunity to resolve his federal constitutional claim, we hold that the District Court did not err in considering Mr. Gaston's application for habeas corpus relief on his properly exhausted federal constitutional claim.

**B**

The State contends that the District Court erred in refusing to evaluate Mr. Gaston's state prisoner habeas corpus claims in accordance with the deferential standards of review of State court decisions set forth in 28 U.S.C. § 2254(d). We disagree. Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As discussed above, the record shows that the Ohio Court of Appeals failed to address Mr. Gaston's federal constitutional claim *de novo* as required by Ohio law. *Gaston*, 2001 WL 1647295,

at *6-8. Instead, the Ohio Court of Appeals applied the abuse of discretion standard that is applicable in determining whether the trial court erred in admitting evidence under State law. *Id.* at *8.

The Ohio Court of Appeals' ruling on the admissibility of the L.B.'s taped statement under Ohio Rule of Evidence 807(A) cannot be construed as an implied, simultaneous ruling on Mr. Gaston's Sixth Amendment claim, because the Court of Appeals failed to apply the *de novo* standard of review applicable to that constitutional claim. In *Maples v. Stegall*, 340 F.3d 433 (6th Cir. 2003), this Court held that "[w]here, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under [§2254(d) of] AEDPA does not apply" because the statute "is applicable only to habeas claims that were 'adjudicated on the merits in State court.'" *Id*. at 436-37 (quoting 28 U.S.C. §2254(d)). *See McAdoo v. Elo*, 365 F.3d 487, 498 (6th Cir. 2004) ("When a state court fails to address the merits of a properly raised ineffective assistance of counsel issue, this court conducts its review *de novo*."). *See also Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) (holding that *de novo* review of a federal confrontation clause claim applies where the state court "examined only [state] law in determining whether the procedure was proper.").

Citing *Early v. Packer*, 537 U.S. 3 (2002), *Yarborough v. Gentry*, 540 U.S. 1 (2003), *Mitchell v. Esparza*, 540 U.S. 12 (2003), and *Price v. Vincent*, 538 U.S. 634 (2003), the State notes that "it is entirely unnecessary for the state courts to cite, *or even be aware*, of the relevant federal case law, so long as the state court reasoning and result is in accord with [Supreme] Court

precedent." (Reply Brief of Respondent-Appellant 1.) The State's reliance on these decisions is misplaced. In each of these cases, unlike the Ohio Court of Appeals' procedure in this case, the state courts expressly considered and rejected the federal constitutional claim presented by the state prisoner.

The Ohio Court of Appeals simply did not address Mr. Gaston's Confrontation Clause claim. Instead, it limited its review to the question whether L.B.'s taped statements were admissible under Ohio Rule of Evidence 807(A). It did not decide whether the application of Ohio Rule of Evidence 807(A) violated the federal Constitution. In *McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003), this Court held that when an issue was not considered by a state court, "there are simply no results, let alone reasoning, to which this court can defer. Without such results or reasoning, any attempt to determine whether the state court decision 'was contrary to, or involved an unreasonable application of clearly established Federal law,' 28 U.S.C. § 2254(d)(1), would be futile." *Id*. at 727.

The fact that the Ohio Court of Appeals held that L.B.'s taped statements were admissible under an exception to that State's hearsay rules does not demonstrate that the trial court did not violate the Sixth Amendment in allowing the jury to consider this evidence. The United States Supreme Court held in *Idaho v. Wright*, 497 U.S. 805 (1990) that the Confrontation Clause "bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Id*. at 814. Because the Ohio Court of Appeals did not determine independently whether admission of the L.B.'s taped statements violated the Confrontation Clause, notwithstanding their

admissibility under Ohio's rules of evidence, the District Court did not err in reviewing the

constitutionality of the admission of L.B.'s taped statements *de novo*.

**V**

**A**

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

U.S. CONST. amend. VI. It ensures the reliability of testimonial evidence against the accused by

subjecting prosecution witnesses "to the rigorous adversarial testing that is the norm of Anglo-

American criminal proceedings." *Maryland v. Craig*, 497 U.S. 836, 846 (1990).

In *Ohio v. Roberts*, 448 U.S. 56 (1980) the Supreme Court stated:

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the fact finding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that there is no material departure from the reason of the general rule.

No. 05-4367
*Gaston v. Brigano*

*Id*. at 65 (quotations and internal citations omitted.)

The Supreme Court held in *Roberts* that hearsay statements are sufficiently reliable to allow their admission without cross-examination of the declarant when they contain "adequate 'indicia of reliability.'" 448 U.S. at 66. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.*[5]

A statement that does not fall within a firmly rooted hearsay exception is presumptively unreliable and inadmissible under the Confrontation Clause. *Roberts*, 448 U.S. at 66. "[I]t may nonetheless meet Confrontation Clause reliability standards if it is supported by a 'showing of particularized guarantees of trustworthiness.'" *Lee v. Illinois*, 476 U.S. 530, 543 (1986) (quoting *Roberts*, 448 U.S. at 66). In *Idaho v. Wright*, 497 U.S. 805 (1990), the Court explained that "[t]he Confrontation Clause . . . bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Id*. at 814.

The Supreme Court stated in *Wright* that "[t]he state and federal courts have identified a number of factors that we think properly relate to whether hearsay statements made by a child witness in child sexual abuse cases are reliable." 497 U.S. at 821. They include spontaneity,

---

[5]The State does not contend that Ohio Rule of Evidence 807(A) is a firmly rooted hearsay exception. Instead, it maintains that L.B.'s taped statements "were trustworthy and reliable." (Opening Brief of Respondent-Appellant 16.) We note also that this Court expressly held in *Stuart v. Wilson*, 442 F.3d 506 (6th Cir. 2006) that "Ohio [Rule of Evidence] 807 is a non-firmly rooted hearsay exception." *Id*. at 515 n.5.

- 19 -

consistent repetition, the mental state of the declarant, the use of terminology unexpected of a child of similar age, and lack of motive to fabricate. *Id*. at 821-22. The Court held that these factors "apply to whether such statements bear 'particularized guarantees of trustworthiness' under the Confrontation Clause." *Id*. at 822.

The Supreme Court did not define "spontaneity" in *Wright*. However, it cited *State v. Robinson*, 735 P.2d 801 (Ariz. 1987) as an example of the application of the spontaneity factor that "properly relate[s] to whether hearsay statements made by a child witness in child sexual abuse cases are reliable." *Wright*, 497 U.S. at 821. In *Robinson*, the Supreme Court of Arizona held that a child's complaint to her mother that her vagina hurt because an adult male babysitter had poked her with a pencil was spontaneous. The child's panties had blood on them and she had a bruise on her labia. *Robinson*, 735 P.2d at 804. The Supreme Court of Arizona concluded the child's statements were admissible and that there was no evidence of "prior interrogation, prompting, or manipulation by adults." *Id.* at 811.

The Ohio Court of Appeals rendered its decision in this matter on December 17, 2001. Mr. Gaston's application for a writ of habeas corpus was filed in the District Court on November 12, 2003. The District Court conditionally granted the application on November 10, 2004. Meanwhile, on March 8, 2004, the United States Supreme Court issued its decision in *Crawford v. Washington*, 541 U.S. 36 (2004). In *Crawford*, the Supreme Court overruled *Ohio v. Roberts* and its progeny. It held that prior testimonial evidence is not admissible in a criminal trial unless the defendant has

had an opportunity to cross-examine the declarant. 541 U.S. at 68-69. The Court reasoned that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

In *Dorchy v. Jones*, 398 F.3d 783 (6th Cir. 2005), this Court held that *Crawford* is not retroactive. *Id.* at 788. Accordingly, we must apply the *Roberts* test to determine whether the record demonstrates particularized guarantees of trustworthiness, in light of the totality of the circumstances, that render the evidence admissible and worthy of belief in the absence of cross-examination. *Id.*

**B**

The record shows that L.B. did not spontaneously or excitedly report to her mother, or anyone else, that Mr. Gaston had "hurt" her by placing part of his body between her legs. The State does not maintain that Ohio Rule of Evidence 807(A) is a firmly rooted hearsay exception. As noted, hearsay statements that do not fall within "a firmly rooted hearsay exception" are "presumptively unreliable and inadmissible for Confrontation Clause purposes." *Lee v. Illinois*, 476 U.S. 530, 543 (1986). We are persuaded that the State has failed to overcome that presumption. L.B. did not accuse Mr. Gaston of hurting her until after her mother was informed by D.M.'s mother that her daughter had been sexually assaulted by Mr. Gaston. L.B. was interrogated *after* she and D.M. had been examined to determine whether they had been molested. L.B. was also aware prior to being questioned that Mr. Gaston had been arrested and D.M. "went to the doctors." She also stated to a

sexual assault specialist that her mother told her why she was going to be questioned.  *See Webb v. Lewis*, 44 F.3d 1387, 1392 (9th Cir. 1994) (holding that the child's hearsay statement, made a week after an alleged serial assault, "was not the state of mind of one excitedly reporting a recent assault.").

The audio-tape of Ms. Holmes's interrogation of L.B. was admitted into evidence.  The transcript of the tape reflects the following colloquy:

| | |
|---|---|
| Holmes: | Now where were you when I just saw you? |
| [L.B.] | At the doctor. |
| Holmes: | At the doctor's.  Now why did you go to the doctor's? |
| [L.B.] | I don't remember. |
| Holmes: | OK, was there something wrong with you? |
| [L.B.] | No. . . |

———

| | |
|---|---|
| Holmes: | Did you (sic) Mom say why you came here? |
| [L.B.] | Umm. |
| Holmes: | You kinda know? |
| [L.B.] | Uh huh. |
| Holmes: | Well, what my job is to tell kids the safety rules.  Like the safety rule about crossing the road. |
| [L.B.] | Yea, like I listen like on Barney.  I listen this way and this way.  They hold hands when they cross the street. |
| Holmes: | Right.  And what would be the safety rule if you saw a stranger? |

[L.B.]   You don't talk to them.

Holmes:   Right, very good.

[L.B.]   Walk away.

Holmes:   That's right!  Now what would be the safety rule if someone would touch your private parts?

[L.B.]   Get mad.

Holmes:   Yeah. Now did anything like that every happen to you?

[L.B.]   [Inaudible]. . .

———

Holmes:   Is it a private part?

[L.B.]   Um. Hmm.

Holmes:   Oh, OK.  Do you have another name for it cause everybody has a name.  Like if you go to the doctor and you get hurt there, you gotta say 'doctor I hurt' and you gotta say what it is.

[L.B.]   (Giggle). Yeah.

Holmes:   What do you call it, honey?

[L.B.]   I don't know.

Holmes:   Do you have a name though but you just don't want to say it now?

[L.B.]   [Inaudible].

Holmes:   But the safety rule would be that if anyone touches, hurts you here, that you didn't have a name for, or here that you didn't have a name for, that you tell.  But sometimes it's hard for kids to tell right away.

[L.B.]   I can't fit it on my teddy bear. . .

———

Holmes:   Right. Right. But that's a safety rule, you tell if somebody touches you here or here and then what it is you tell and then the

- 23 -

|          | policemen, like the policeman here, then (sic) make sure that it doesn't happen again and that you're all right. That's why we wanted you to go to the hospital, make sure you're all right. |
|----------|------|
| [L.B.]   | Yeah. Um Dorothy went to the doctors and Jimmy went to jail. |
| Holmes:  | Ah, who's Jimmy. |
| [L.B.]   | My Aunt Maxine's husband. |
| Holmes:  | Your Aunt Maxine's husband. What do you think of Jimmy? |
| [L.B.]   | I don't like him. |
| Holmes:  | Why? |
| [L.B.]   | 'Cause, I don't like to go up there anymore. |
| Holmes:  | You don't like to go up there anymore? |
| [L.B.]   | Mom won't cut this right here. . . . |

———

| | |
|----------|------|
| Holmes:  | Well, why don't you want to go to Jimmy's house? |
| [L.B.]   | 'Cause. |
| Holmes:  | Is he nice to kids. |
| [L.B.]   | No. |
| Holmes:  | No, what does he do, honey? |
| [L.B.]   | I don't know. I don't want to go there. |
| Holmes:  | Is it something he should be doing. |
| [L.B.]   | [No verbal response]. |
| Holmes:  | You're shaking your head. What's that mean? |
| [L.B.]   | No. |
| Holmes:  | Is he doing something to you he shouldn't? |
| [L.B.]   | He's doing something to me. |
| Holmes:  | He's doing something to you? When was the last time you were at his house? |

[L.B.]       Um.

Holmes:     Was it during school or during the summer?

[L.B.]       Summer.

Holmes:     Summer, were you in kindergarten still when you were at his house or was school out?

[L.B.]       School out. I was in kindergarten. I had a patch. I went to kindergarten and [inaudible] and my brother said I am a boy.

Holmes:     You are a boy?!

[L.B.]       I am.

Holmes:     No you are not!

[L.B.]       Dorothy said . . . . Dorothy said I'm a boy.

Holmes:     Oh, you're a girl.

[L.B.]       My Mom and my brother didn't [inaudible] pretty.

Holmes:     Uh huh.

[L.B.]       (sigh).

Holmes:     Well what did . . . I know and the other one hurts and I took it out and I'll probably take this one out too. It kind of looks funny with just one.

[L.B.]       Yeah.

Holmes:     What Jimmy did, you said he did something to you. Does it have to do with your body? Oh, OK, could you point with this.

[L.B.]       Right there.

Holmes:     OK. Could you put a big circle. What part of your body does it have to do with?

            What went there?

[L.B.]       Between his legs.

Holmes:     Between his legs. Let's see if we can find between his legs. Do you see it on any of these pictures? OK. What do you call that on a boy?

| | |
|---|---|
| [L.B.] | Jimmy. |
| Holmes: | What honey? |
| [L.B.] | Jimmy. |
| Holmes: | This is Jimmy? |
| [L.B.] | That looks like Jimmy. |
| Holmes: | That looks like Jimmy. OK. |
| | What's Jimmy's last name? |
| [L.B.] | I don't know. Jimmy Gaston. |
| Holmes: | Gaston, OK, what part of his body touched you? OK, what do you call that? |
| [L.B.] | I don't know. |
| Holmes: | OK could you put a big circle on what, what . . . . What did he say about that part of the body touching you? |
| [L.B.] | Between my legs. |
| Holmes: | Uh huh, Oh is that where this went? How did that feel? |
| [L.B.] | It hurt. |
| Holmes: | The last time you went to his house, is that when it happened. Are you sure? Did it ever happen at your house? |
| [L.B.] | [Inaudible]. |
| Holmes: | So it happened one time. It happened . . . |
| [L.B.] | . . . at his house. |
| Holmes: | How many times did he do this? |
| [L.B.] | Once. |
| Holmes: | Any other times? Who else was in the house when he did this? |
| [L.B.] | My brother Buddy. |
| Holmes: | What, honey? |
| [L.B.] | My brother Buddy. I cracked my knuckle. |
| Holmes: | That's all right. Your brother Brian. |

| | |
|---|---|
| [L.B.] | Buddy. |
| Holmes: | Buddy. |
| Holmes: | You have a brother named Buddy? |
| [L.B.] | Yeah. |
| Holmes: | OK, where was Buddy when he was doing this? |
| [L.B.] | Downstairs sleeping on the couch. |
| Holmes: | Oh, OK. |
| | So what room of the house did this happen in? |
| [L.B.] | Upstairs in his bedroom. |
| Holmes: | How did it happen that you were in his room? |
| [L.B.] | (Sighs). |
| Holmes: | Cause if your brother was sleeping were you supposed to be sleeping? |
| [L.B.] | What? |
| Holmes: | With your brother? |
| [L.B.] | Sometimes. |
| Holmes: | Where else when you sleep, when you sleep at Jimmy's house where else do you sleep? |
| [L.B.] | Upstairs in a room by myself. |
| Holmes: | Whose house did this happen in? |
| [L.B.] | Jimmy's. |
| Holmes: | Do you have a room at Jimmy's?  You're shaking your head.  What does that mean? |
| [L.B.] | No. |
| Holmes: | OK. How many times did Jimmy do this. |
| [L.B.] | Once. |
| Holmes: | OK, and since it happened, have you been back? |
| [L.B.] | At the picnic. |

| | |
|---|---|
| Holmes: | What honey[?] |
| [L.B.] | At the picnic. |
| Holmes: | At the picnic. What kind of a picnic was it? |
| [L.B.] | It was at [inaudible] Park. |
| Holmes: | I can't hear you honey. |
| [L.B.] | [Inaudible] Park. |
| Holmes: | Was that this school year? |
| [L.B.] | No. |
| Holmes: | No. |
| [L.B.] | No, it was on the weekend. |
| Holmes: | On a weekend. OK, so maybe I could ask your Mom when was the last time you slept at Jimmy's? What did he say about all this? |
| [L.B.] | He didn't say nothing. |
| Holmes: | How did it feel when it happened? |
| [L.B.] | It hurt. |
| Holmes: | What made you think not to tell? |
| [L.B.] | He told me not to tell. |
| Holmes: | What would happen? |
| [L.B.] | He will kill my family. |
| Holmes: | In Jimmy's house you have your own room? |
| Holmes: | So I understand this right, Jimmy put this part of his body to here and it hurt. |
| | Did anything happen, did you see this part of the body on him? |
| [L.B.] | [Inaudible]. |
| Holmes: | Then after this happened, did you stay in Jimmy's room? |
| [L.B.] | No. |
| Holmes: | No, what happened, what did you do? |

[L.B.]   I said I had to go the bathroom.

Holmes:   You said you had to go the bathroom and then what did you do?

[L.B.]   Go in the bathroom.

Holmes:   Go in the bathroom and then what did you do?

[L.B.]   Slept with my brother.

Holmes:   What honey?

[L.B.]   Slept with my brother.

Holmes:   Oh, downstairs on the couch? What other parts of your body had Jimmy touched?

[L.B.]   [Inaudible].

Holmes:   And he said he would kill your family if you told.

Did he ever say if there was any other kids that he talked about? What other kids go to his house?

[L.B.]   Me and my brothers.

Holmes:   You and your brothers.

[L.B.]   If it's Christmas, I [Inaudible].

Holmes:   Had this happened before Christmas or after?

[L.B.]   After.

Holmes:   After Christmas. What teacher did you have when this had happened?

[L.B.]   [Inaudible].

Holmes:   OK, so who was your teacher when this happened?

[L.B.]   [Inaudible].

Homes:   That was the second kindergarten teacher you had?

[L.B.]   After Mrs. [inaudible].

Holmes:   OK. What's that honey?

[L.B.]   [Inaudible].

| | |
|---|---|
| Holmes: | Oh, yeah. Who else has ever done anything to this part of your body on you. |
| [L.B.] | Nobody else. |
| Holmes: | OK. OK. Very good. We can go out and see your Mom now, you're done. |

The record also reflects that L.B.'s taped statements were not consistent. Prior to selecting the jury in this matter, the trial judge questioned L.B. to determine whether she was competent to testify as a witness against Mr. Gaston. Contrary to L.B.'s statement to Ms. Holmes that Mr. Gaston had "hurt" her once in his bedroom during the summer, L.B. told the trial judge that she had not gone to his house. She also stated that she had been hurt by her mother and her brothers had hurt her, but she had never been hurt by anyone else. L.B. also denied telling any lies in response to the trial court's questions. These statements expressly contradicted her report to Ms. Holmes that Mr. Gaston had "hurt" her at his house.

The trial court found that L.B. was competent to testify. The trial court also held that L.B. was unavailable as a witness because she indicated she would not testify against Mr. Gaston. The trial court overruled Mr. Gaston's objection to the admission of L.B.'s taped statements. It reasoned as follows:

> In accord with [Ohio Rule of Evidence] 807(A) (1), the court finds that the totality of circumstances surrounding the making of the statement to Karen Holmes [] provides particular rise to guarantees of trustworthiness. Court finds that the interview came about as a result of a separate allegation of sexual abuse of another child, [D.M.].

> The interview appears to have been conducted in accord with recognized protocol. The child's answers to the questions appears [sic] spontaneous.

> The child stated that she knew the defendant, visited his home, knows the rooms of the house, and the particular room where the alleged incident occurred. She knows Maxine as his girlfriend, and that Maxine was not home, and she knows safety rules. She also provides an adequate description of after effects. The first of which is her knowledge that the act hurt her. And also noteworthy, is her knowledge that she went to the bathroom after it happened.

The evidence does not support the trial court's finding that L.B.'s response to interrogation was "spontaneous." The term "spontaneous" is defined as "1: proceeding from natural feeling or native tendency without external constraint 2: arising from a momentary impulse." *Merriam-Webster's Collegiate Dictionary* 1206 (11th ed. 2003). L.B. did not complain to anyone that she had been "hurt" by Mr. Gaston until she had been examined after D.M. reported that she had been sexually assaulted by Mr. Gaston and was interrogated by Ms. Holmes to determine who had caused the injury to her vagina. We cannot characterize L.B.'s answers to the questions posed by a skilled investigator as "arising from a momentary impulse" or without "external constraint."

Mr. Gaston's counsel pointed out that L.B. had stated to the trial court during the competency proceeding that Mr. Gaston did not hurt her. The trial court responded that "she did

provide inconsistent answers at that time. One of which is the answer that you stated. And the court certainly understands that is a concern of the defendant's."

The trial court apparently overlooked the fact that L.B. informed the court that L.B. not only denied that Mr. Gaston hurt her, she also stated she had never been in his house. The trial court violated Mr. Gaston's Sixth Amendment right to confrontation in ruling that L.B.'s taped statements were admissible. Because of L.B.'s unmistakably inconsistent statements and her lack of spontaneity in complaining about Mr. Gaston's conduct, we are persuaded that L.B.'s taped statements were inadmissible because they were not trustworthy.

**D**

Having concluded that the trial court erred in admitting L.B.'s taped testimony, we must consider if the error was harmless. *See United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006) ("We apply the harmless-error test to evidentiary errors . . . including evidence admitted in violation of the Confrontation Clause."). An error by the trial court is not harmless if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). S*ee also Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999) (adopting the *Brecht* standard for harmless error). In the instant case, L.B.'s taped statements contained the only evidence that she had been raped by Mr. Gaston. While there was physical evidence that L.B. had been the victim of sexual abuse, the physical evidence did not support an inference that Mr. Gaston was the perpetrator. The denial of the right to cross-

examine L.B. had a substantial and injurious effect on the jury's verdict.  Accordingly, we

conclude that the trial court's errors were not harmless.

We AFFIRM the District Court's judgment.